## STATE v. GEORGE HAROLD OUTING, JR.

(Filed October 11, 1961.)

**1. Criminal Law § 71—**

Where the confession of the defendant is challenged on the ground that it was not voluntary, the question of its voluntariness is a preliminary question to be determined by the court from evidence heard in the absence of the jury.

**2. Same—**

Where, upon preliminary hearing, the court finds that defendant's confessions were voluntary, such finding is conclusive when supported by the evidence notwithstanding conflicts in the testimony of the officers and defendant.

**3. Same—**

The fact that the evidence on the *voir dire* discloses that after defendant had shown the officers where the murder weapon was hidden, an officer standing some distance from defendant, fired his pistol several times at used flashlight bulbs, does not preclude a finding that the confession of defendant, made the following day, was voluntary, notwithstanding the testimony of defendant that the officer shot toward him, the bullet striking a short distance from his feet.

APPEAL by defendant from *Patton, J.,* January 9, 1961, Regular Criminal Term (Schedule A) MECKLENBURG Superior Court.

Criminal prosecution upon a bill of indictment charging the murder of James T. Hamilton in the perpetration of a felony — robbery.

In summary, the State's evidence disclosed the following: James T. Hamilton was a taxi driver for Yellow Cab Company in the city of Charlotte. He was on duty the night of November 16, 1960. His last communication with the office was by two-way radio at about 12:50. Thereafter his cab failed to answer calls.

On the following morning his dead body was discovered under the wheel in his taxicab which was partially concealed in some bushes near the dead end of Celia Avenue in the outskirts of Charlotte. Hamilton's clothing and the front seat of the cab were bloody. Rosetta Street intersects Celia Avenue about 200 yards from the point where the cab was found. The defendant lived on Rosetta Street, in the second house from the intersection.

The coroner, a clinical pathologist, examined Hamilton's body at 12:00 noon on November 17. The examination revealed a cut on the right thumb and two stab wounds in the chest, one of which pierced the heart. Hamilton's leather belt was cut. The leather change purse which he customarily wore on his belt was missing.

About four o'clock on the afternoon of the 17th the city officers, acting on a tip, interviewed George Harold Outing. At this stage in the trial "the defendant duly objected to all extrajudicial statements made to the personnel in the police department which purported to be a confession, on the ground that it was obtained involuntarily, and by force under duress and coercion, and in violation of the provisions of the 14th Amendment to the Constitution of the United States." Whereupon Judge Patton excused the jury and in its absence proceeded to conduct an inquiry as to what statements the defendant made to the officers and under what circumstances they were made.

In substance, the officers testified they had information the defendant might know something that would aid "in breaking the case." They went to his home on the afternoon of November 17 (Thursday) and he seemed reluctant to talk in the presence of his wife who "wanted him to be quiet," so the officers asked him to come to police headquarters for an interview. One of the officers left his card with the defendant.

About nine o'clock that evening he reported to police headquarters for an interview with the officers. During the course of the interview he said he saw three boys at the corner of Celia Avenue and Rosetta Street as he came home from work about 1:30 a.m. He gave the name of one of the boys. He stated one of them had a long knife. The officers took him on a tour of the neighborhood, contacted the boy whom he had named, investigated the boy's alibi and released him. Outing then named others, including his uncle, whom he had seen in the vicinity on his

way home. At the end of the interview the officers permitted him to go home.

On the following day (Friday) after checking as many of those named by the defendant as could be found, and finding nothing connected them with the crime, the officers took the defendant in custody. He continued to name different people whom he had seen on his way home, claiming one of them had a long knife. On Friday night he was placed in jail. However, on Saturday the officers took the defendant to the vicinity of Celia Avenue and Rosetta Street. "He stated he would take us and show us where he had hidden the knife that was used in the killing . . . he lifted the manhole cover and pointed down and said, 'There's the knife.'" The officers removed a long French knife from the water in the manhole. Present at the time were Officers Homberg, Porter, and Fesperman. The latter had just joined them shortly before the discovery of the knife. Upon cross-examination, officers admitted that Fesperman fired his revolver twice at a flashlight bulb some 30 feet away; that he was not near the defendant at the time, and that he made no threats but stated that he wanted to test some old ammunition and fired only two shots. On Saturday night the defendant's wife came to the jail and at her request she and the defendant were permitted to confer in one of the private rooms on the second floor of the city jail. At this time the defendant jumped from the window and escaped.

After his re-arrest at the house of a relative in Charlotte on Sunday morning, he confessed, telling in substance the following story: He had been working as a dishwasher in a restaurant at the Dobbs House; that he left work about 11:30 p.m. on Wednesday, November 16. He picked up a long kitchen knife, concealed it in his coat, intending to use it in breaking open a vending machine. However, on his way home a Yellow Cab passed. He called to the driver, got in the back seat as a passenger and gave the driver an address, and when the driver got to the address and stopped, he reached over from behind, put the knife close to the taxi driver's face, and said, "I will take your money." Mr. Hamilton said, "Oh, no you won't," and grabbed the knife. They scuffled over the knife. "Mr. Hamilton was an older man and weaker, and he gave in first and he let his grip slip and the knife plunged into his chest." He stated he didn't know how many times he stabbed or struck or hit Mr. Hamilton; that to the best of his remembrance he said it was four or five times; that he drove the cab to where it was found, took the wallet, change purse and a billfold with some change which he got out of Mr. Hamilton's pocket. Thereafter he pushed Mr. Hamilton over under the wheel of the cab, left, took the money out of the purse, hid the knife in the manhole, and went home. That on Sun-

day night after the defendant's re-arrest that morning, his father came to the jail and the defendant said to his father, "I did it." The officers testified the admissions were made voluntarily, without any threats or show of violence or inducements whatever.

The defendant testified he had nothing to do with the death of Mr. Hamilton; that he did not tell the officers where the knife was. "If I made a confession it was not to my knowledge. I don't know if I made one because I was all upset . . . I was afraid the man was going to kill me so they say I made a confession. . . . After Mr. Fesperman shot and promised to kill me I would admit anything. He said, 'This is the same damn thing that will happen to you if you don't confess to this.' He shot several times about seven or eight inches from my feet. He was shooting at me . . . He pointed the gun at me and that time (Friday) I had not told anybody that I was implicated. It scared me because I never had been shot at before."

The defendant further testified that the officers roughed him up. His father testified that when he saw his son on Sunday his face was swollen. His wife testified to the same condition when she saw him on Saturday night.

On cross-examination, the defendant admitted he told his father in police headquarters, "I did it," but he did not mean to confess the killing of Mr. Hamilton.

The officers testified the defendant was never mistreated in any way and that they never observed any swelling on his face at any time. A newspaper reporter interviewed the defendant in jail. He did not observe any evidence of injury.

At the conclusion of the hearing in the absence of the jury, Judge Patton held the admissions to the officers and in the presence of the defendant's father were voluntarily made and permitted them to be detailed in the evidence as defendant's admissions, to which the defendant objected.

The State called as a witness Mr. Conrad Taylor who testified that in equipping his restaurant he bought two French-type knives for use in his kitchen. The defendant, employed as a dishwasher, had access to these knives. After November 16 or 17 one of the knives was missing. State's Exhibit No. 5 (the knife found in the manhole) is exactly the same style and the same shape.

The defendant testified that he didn't have anything to do with the killing of Mr. Hamilton.

The jury returned a verdict of guilty of murder in the first degree and at the same time and as a part of the verdict the jury recommended the defendant's punishment be imprisonment for life. To the verdict and judgment, the defendant excepted and appealed.

*T. W. Bruton, Attorney General, H. Horton Rountree, Asst. Attorney General, for the State.*
*Charles V. Bell, for defendant, appellant.*

HIGGINS, J.   The defendant contends the court committed error by holding the defendant's confessions voluntary, and by admitting them in evidence. The law governing the admissibility of confessions has been the subject of frequent review by this Court. The leading authorities are collected in *State v. Davis,* 253 N.C. 86, 116 S.E. 2d 365, *Certiorari* denied 365 U.S. 855, 5 L. ed 2d 819. To the many cases there cited we may add *State v. Biggs,* 224 N.C. 23, 29 S.E. 2d 121; *State v. Jones,* 203 N.C. 374, 166 S.E. 163; *State v. Livingston,* 202 N.C. 809, 164 S.E. 337, cited by the defendant.

When the State offers a confession in a criminal trial and the defendant objects on the ground it was not voluntary, the question thus raised is determined by the judge in a preliminary inquiry in the absence of the jury. *State v. Davis, supra.*

The trial judge hears the evidence, observes the demeanor of the witnesses and resolves the question. The appellate court must accept the decision if it is supported by competent evidence.

In the preliminary inquiry the testimony of the officers was unequivocal that the confessions were made voluntarily, without fear, threat, coercion, or inducement. On the contrary, the defendant said he was roughed up, intimidated by being shot at, and his life threatened. His only corroboration was the evidence of his father and his wife that his face was puffed up and the admission of the officers that Detective Fesperman fired two shots from his service revolver while the investigation was under way and the prisoner was in the field with the officers. The defendant testified that the officer shot at him and shot within a few inches of his feet. This the officers denied. Fesperman himself testified: "After the fingerprint man had taken all of the pictures and thrown the bulbs up there in the woods, and, if I am not mistaken, we were getting ready to leave, the cover was back on (manhole) and I had some old ammunition and said I am going to try it . . . I ain't never talked to Outing . . . I don't recall seeing Outing after that." Other officers corroborated Fesperman that he was some distance from Outing and that he shot in the woods at a flashlight bulb.

The shooting by Fesperman was in violation of police regulations. It was highly improper, and, at best, a thoughtless blunder. However, the firing of the shots occurred after the defendant had helped locate the knife, and as the officers were leaving the scene with the prisoner. The occurrence took place on Saturday. Neither at the time nor there-

after that day did the defendant make any admission. Fesperman did not participate in the investigation further. At the jail that night the defendant escaped. He was re-arrested next day and thereafter made the confession both to the officers and to his father. No doubt the officers confronted the defendant with the many inconsistencies and contradictions in his story and the suspicion attached to his claim to have seen so many different people near the scene — one with a long knife — at such an hour. When caught in a web of his own weaving he apparently thereafter confessed.

Judge Patton, with patience, care and discrimination, conducted the preliminary inquiry, saw and heard the witnesses, thereupon found the defendant's statements were voluntary. Substantial evidence supports the finding. It is binding on appeal. In this connection we quote from *Watts v. Indiana,* 338 U.S. 49: "In the application of so embracing a constitutional concept as 'due process,' it would be idle to expect at all times unanimity of views. Nevertheless, in all the cases that have come here during the last decade from the courts of the various states in which it was claimed that the admission of coerced confessions vitiated convictions for murder, there has been complete agreement that any conflict in testimony as to what actually led to a contested confession is not this Court's concern. Such conflict comes here authoritatively resolved by the State's adjudication." In like manner this Court is bound by the determination made in the trial court, if supported by evidence. There the witnesses are heard and the facts are found. In the trial below, there is

No error.