STATE OF NORTH CAROLINA v. LOUIS ANTHONY LOGNER.

(Filed 14 January, 1966.)

**1. Criminal Law § 71—**

Intoxication does not render a confession inadmissible unless at the time defendant is so drunk as to be unconscious of the meaning of his words, and intoxication to a degree less than mania relates to the credibility of the statement, and the trial court correctly so instructs the jury.

**2. Same—**

The competency of an extra-judicial confession is a preliminary question to be determined by the trial court upon the *voir dire.*

**3. Same—**

Where the trial court finds upon the *voir dire* from conflicting evidence that the confession in question was freely and voluntarily made after defendant had been advised of his right not to speak and his right to have counsel, and that defendant was at that time not so intoxicated as to amount to mania, the findings, being supported by evidence, are conclusive on appeal.

APPEAL by defendant from *Bickett, J.,* July 28, 1965 Special Criminal Session of DURHAM.

Criminal prosecution upon a bill of indictment which charges defendant with safecracking and safe robbery growing out of the facts hereinafter detailed. On the night of November 16-17, 1964, thieves broke into the office of McCracken Oil Company in Oxford, North Carolina. They removed the door from the walk-in vault, dissevered the hardened steel money chest from the concrete in which it was encased, and carried it away. The chest contained about $1,300.00 in cash and $8,700.00 in checks. In consequence of information given them by defendant, law enforcement officers located the rifled safe in a rural area of Orange County and charged defendant with a violation of G.S. 14-89.1. Upon the trial, when the State offered in evidence the statements which defendant had allegedly made to the officers, defendant objected for that at the time

the detectives talked to him (1) he was not warned of his constitutional rights to remain silent and to be represented by counsel; and (2) he was so intoxicated that all his statements were involuntary.

In the absence of the jury, the judge heard evidence offered by both the State and defendant bearing upon the nature of the confession. The evidence for the State tended to show these facts:

About 11:30 a.m. on November 18, 1964, Detectives Hartley and Morris of the police force of the City of Durham observed defendant, who "wasn't walking like a sober man." When he got into his car the officers followed him, "trying to get him before he had a wreck." Defendant, however, collided with two cars when the detectives were practically behind him. At that time, they had no notion that he was connected with the Oxford safe robbery although (they said) he would have been a "natural" suspect in "any safe job." They arrested defendant for drunken driving. Detective Morris testified:

> "Louis (defendant) said something pertaining about he would pay the other people's damages and that I knew where the money came from, and I knew where he got the money. He said 'I will pay the damage, I have got the money, you know where the money came from,' and I told him right then, I said 'Louis, now, I want to warn you that anything you tell me, that can be used against you in a court of law. You have got a right to an attorney, you don't have to tell me anything.' "

At police headquarters defendant kept talking about paying the damage. He was again warned of his right to remain silent and to have counsel. His reply was, "I can tell you anything I want to, you have to prove it." The officers then talked to defendant briefly about "where he got the money." He went into detail about "Mr. George Johnson's safe on Indian Trail in Durham" and offered to show the officers where it was. They had heard nothing of the Johnson safe job which had been reported to the County Sheriff, and, although they had read about the Oxford robbery in the newspaper, they were not particularly interested in the McCracken Oil Company safe because Oxford was not in their jurisdiction. Defendant, however, volunteered the information that he had something to do with the McCracken safe job; that he went over there in his car with Claiborne McKee and Benjamin Edward Ranson; that, while Ranson watched from across the street with a shotgun, they cut a hole in the fence with a pair of bolt cutters, went in the building, and "busted open the vault—ripped it from the top down—and went in and got the nigger-head safe out and brought it back to Durham." According to the officers, although defendant was under

the influence of intoxicants, he knew what he was saying, and they listened while he did most of the talking.

Between 2:30 and 3:00 p.m., the detectives again talked to defendant for about thirty minutes. He had been given no liquor in the meantime. "He didn't need any liquor to loosen him up. He was already gone." That afternoon defendant and the officers went to Orange County looking for the Oxford safe. After a brief and fruitless search in the vicinity of Murphy School, defendant said, "Lets go back to town." On the way back, defendant brought up the Johnson safe again and said "I will show you where that is." He then directed them to a bank in the woods where, about 4:00 p.m., they found a safe "which turned out to be the Johnson safe."

About 7:30 that night, defendant was questioned by Morris, S. B. I. Agent Harton, and Chief of Police White of Oxford. According to their testimony, defendant obviously had been drinking intoxicants, but he was not then drunk. At the beginning of this interrogation, Harton identified himself and introduced Chief White to defendant. He said,

> "I told him that he didn't have to talk with us, that anything he said could be used against him, that he was entitled to a lawyer if he wanted one and we would be glad to call him one if he wanted us to. He said he didn't need a lawyer."

Harton, who had not talked with defendant previously, asked him to go back over the story of the "deal in Oxford." He spoke freely and voluntarily. While giving his statement he asked for a drink, but it was refused.

> "He (defendant) said he was there Monday night at the Mc-Cracken Oil Co., getting the safe . . . (H)e and two more men were there. They went in on his car which was a 1958 DeSoto and parked on a dirt street near the McCracken Oil Co. . . . He said they cut the fence on the outskirts of the place near a used car lot with a pair of bolt cutters. He said a fellow by the name of Claiborne McKee and an escaped convict by the name of Ranson were there. They had a long prize bar with a fork on one end and hook on the other, a sledge hammer and a chisel and bolt cutters. He said that he and McKee were on the inside and that Ranson was across the street at a lumber company with a shotgun. . . . He was very cooperative. He said there was approximately $1,800 in it, in cash, that the checks were burned up and that he got approximately $390 for his share."

Defendant's criminal record was well known to Harton, who re-

garded him as a professional safecracker. At no time did the officers themselves, or any other person to their knowledge, give defendant any intoxicants, or offer him any other inducement to talk. Defendant never asked to call his mother or any other person.

The next morning (November 19th) defendant was interviewed by the same officers and a deputy sheriff from Goldsboro about a safe robbery there. He was again told that he had a right to remain silent and that he could have an attorney if he wanted one. Later in the day defendant and the officers went once more to the vicinity of the Murphy School where, after some searching, defendant finally pointed out a high bank on top of which they found the Oxford safe. Defendant then stated that after the safe was removed from the office in Oxford, he and his confederates brought it back to his house in Durham, where it remained until about 12:30 or 1:00 the next day. He then took it to a garage in Durham, and the owner cut it open with a torch. After rifling the safe, he dumped it in Orange County. He declined to give the officers the address of the garage or the name of the operator. He said the officers would be surprised if they knew.

Defendant's evidence on the *voir dire* tended to show: He began drinking early on the morning of November 18, 1964, as well as taking "green hornet" (amphetamine) pills. He had been on a binge for four or five weeks. He started drinking in the first grade and has had a drinking problem all of his adult life—drinking anything from shaving lotion and canned heat to shellac. When the officers arrested him for drunken driving, he was so drunk and "pilled up" he could not get out of his car. Immediately after he was taken to the police station, the officers gave him four two-ounce cups of whiskey which he drank "as fast as possible." Thereafter, his mind was a complete blank; he remembers nothing until the morning of the 19th, when he was told he had made a statement. He then told the officers, including the one from Goldsboro, that he would plead guilty to anything if they would let him lie down. Instead, they continued to question him. He was so sick he was unable to eat that day. He told Morris that he was drinking and riding around with "some Georgia boys" when they dumped out a safe from the trunk of the car in Orange County. He had met these "Georgia boys" several months before but he did not know their names. To the best of his memory, defendant never told anybody he was involved in the McCracken Oil Company safe robbery. The "Georgia boys" had picked him up about 3:00 a.m. On the night of November 16-17, he had been at Am. Vet's Post No. 1 until about 2:00 a.m., when he drove himself home. On the morning of the 17th, he went to his mother's home at 8:30, then down town. That after-

noon, he got drunk and went home where he stayed until evening, when he went to the Morgan Street Am. Vet's Club where he stayed until he took two girls (whose names he did not know) shopping and spent $30.00 on clothes for them. He returned to the Club and eventually went home drunk. About 6:30 a.m. on the 18th, he went to Young's place where he stayed until noon. He left there drunk and was arrested by Detective Morris for drunken driving shortly thereafter.

Defendant's cell mate at the City jail testified that defendant was drunk on the 18th when he was brought in, and that on the 19th defendant brought in two pints of liquor in a candy box. The two of them drank the liquor "right quick." Defendant's mother and his former wife corroborated defendant's testimony that he was drunk on November 17th and 18th.

Upon the foregoing evidence the judge made detailed and specific findings of fact. *Inter alia,* he found that at the time of his arrest and thereafter, defendant was informed that he had a right to remain silent and to make no statement to the officers; that he had a right to counsel; that defendant, although under the influence of intoxicating liquor, was aware of his constitutional right to have counsel and to remain absolutely silent. The judge further found that defendant was not furnished any intoxicants by any police officers or by anyone else who could be identified in court; that when defendant was advised of his right to counsel, he replied that he did not need one; that defendant's intoxication did not amount to mania and that he was aware of the statements which he made to the officers. The court concluded

". . . that none of the Constitutional rights pled by the defendant were or have been violated and that his admission and confessions to officers Detective R. G. Morris and L. M. Harton were given freely, voluntarily, without reward or hope of reward, or any other inducement and that said statement should be admitted into evidence to be given weight by the jury to which the jury finds they are entitled."

The evidence which the judge heard on the preliminary examination to determine the admissibility of the defendant's purported admissions was repeated in more detail before the jury. In addition, both the State and defendant offered the testimony which, for the State, tended to corroborate defendant's statements to the officers and which, for defendant, mainly tended to corroborate his evidence of extreme intoxication.

The jury returned a verdict of guilty as charged in the bill of indictment. From a sentence of imprisonment, defendant appeals,

assigning errors, all of which, in effect, relate to the competency of his alleged confession.

*Attorney General T. W. Bruton and Andrew A. Vanore, Jr., Staff Attorney, for the State.*
*Nicholas Galifianakis for defendant appellant.*

SHARP, J. Defendant contends (1) that his intoxication on November 18th and 19th rendered any statements he may have made to the officers involuntary; and (2) that, if the officers advised him of his constitutional rights, his intoxicated condition made such advice entirely ineffectual.

This Court has considered a defendant's plea of drunkenness as a bar to the admissibility of his confession in the following cases: *State v. Painter*, 265 N.C. 277, 144 S.E. 2d 6; *State v. Stephens*, 262 N.C. 45, 136 S.E. 2d 209; *State v. Isom*, 243 N.C. 164, 90 S.E. 2d 237, 69 A.L.R. 2d 358. From them this rule emerges: Unless a defendant's intoxication amounts to mania—that is, unless he is so drunk as to be unconscious of the meaning of his words—his intoxication does not render inadmissible his confession of facts tending to incriminate him. The extent of his intoxication when the confession was made, however, is a relevant circumstance bearing upon its credibility, a question exclusively for the jury's determination.

In his charge, the judge made it crystal clear to the jurors that they were sole judges of the credibility of all witnesses who had testified and that, if they were satisfied beyond a reasonable doubt that defendant had made the challenged statements to the officers, they should consider the condition of the defendant at the time he made the statements. This was a substantial compliance with the requirement laid down in *State v. Isom, supra*.

It is settled law in this jurisdiction that the competency of an extra-judicial confession of guilt is a preliminary question to be determined by the trial judge in the manner set out in *State v. Whitener*, 191 N.C. 659, 132 S.E. 603 and *State v. Rogers*, 233 N.C. 390, 64 S.E. 2d 572. A finding that the confession was voluntarily made will not be disturbed on appeal "unless accompanied by some imputed error of law or legal inference." *State v. Grass*, 223 N.C. 31, 25 S.E. 2d 193. Ordinarily the rule is stated to be that if the court's finding is supported by any competent evidence it will be sustained, *State v. Outing*, 255 N.C. 468, 121 S.E. 2d 847; if not, it will be set aside. *State v. Chamberlain*, 263 N.C. 406, 139 S.E. 2d 620. Much of the evidence which the trial judge heard was conflicting, but "where the evidence is merely in conflict on the question as to whether or not a confession was voluntary, the ruling of the court is conclusive

on appeal." *State v. Hammond,* 229 N.C. 108, 47 S.E. 2d 704. The evidence fully supports Judge Bickett's findings. Defendant had and was accorded the right to a preliminary hearing on the competency of his alleged confession. The judge, however, was not required either to believe or to accept his testimony as if it were true.

Upon the argument, defendant's counsel complained that the trial judge "wanted to relate defendant's confession to the truth" instead of to the question whether he had exercised an "enlightened choice" in making it. In defendant's brief, he says:

> "The reason for excluding involuntary confessions is not because they might be unreliable, but rather that admission of such confession violates one's constitutional rights. So the issue really boils down to the simple question which right is to take priority under the law, the right of society to be free from crime or the individual rights of the accused?"

We indulge the hope that these two rights are not on a collision course. In any event, we do not have to fix a priority in this case. The law of this State does not require its enforcement officers to turn a deaf ear to a liquor head who wants to talk lest he give them some information which would solve a crime, or lest his tongue, loosened by alcohol, utter an incriminating statement he might later regret. Defendant here is not an inexperienced juvenile delinquent. He testified that he had "been before the court in a large number of cases" and knew "a thousand or more (of) prisoners in the penal system by face." The officers were not required to give him a head start as if they were playing the childish game of cops and robbers. On the contrary, having advised him of all his constitutional rights, it was their duty to pursue his lead and to obtain from him any information he would voluntarily give.

Here, as in *State v. Outing, supra,* the trial judge "with patience, care and discrimination, conducted the preliminary inquiry, saw and heard the witnesses (and) thereupon found the defendant's statements were voluntary. Substantial evidence supports the finding. It is binding on appeal." *Id.* at 473, 121 S.E. 2d at 850.

All of defendant's assignments of error are overruled. In the trial we find

No error.