428 P.2d 1013.

**The STATE of Arizona, Appellee,**
**v.**
**Richard McFALL, Appellant.**
**No. 2 CA–CR 74.**

Court of Appeals of Arizona.
June 2, 1967.

Rehearing Denied June 30, 1967.

Review Granted Sept. 26, 1967.

**540**

Darrell F. Smith, Atty. Gen., Gary K. Nelson, Asst. Atty. Gen., Phoenix, William J. Schafer, III, County Atty., Pima County, Tucson, for appellee.

Garven W. Videen, Tucson, for appellant.

MOLLOY, Judge.

Richard McFall brings this appeal seeking reversal of his conviction of five counts of obtaining narcotics by fraud or deceit in violation of A.R.S. § 36–1017. The defendant, among his several contentions, raises serious constitutional problems in the area of voluntary confessions and the extent of judicial inquiry mandated to determine the voluntariness of a confession made by a drug addict to the police.

There is surprisingly little disparity in the record as to the " * * * external, 'phenomenological' occurrences and events surrounding the confession."[1] The testimony of the two police officers who arrested and interrogated the accused and the testimony of the accused himself, who testified before the court in the absence of the jury on the voluntariness issue (but who did not take the stand in his own defense before the jury), overlaps with little conflict.

The arrest of the defendant occurred on December 14, 1965. The two police detectives, Grant and Hitchcock, were searching for the defendant at the time, having received information from two druggists that forged prescriptions had been passed by the defendant. The detectives had the license number of the defendant's car which they sighted on a side street in the City of Tucson, Arizona, at 11:25 a. m. The police officers were in an unmarked car and were not in uniform. They drove up beside the defendant's car and told him that his left rear tire was going flat. The defendant pulled partially over to the side of the road, slowing his car in the process. Whereupon Detective Grant drew his gun, showed his

---

1. Quote from Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961).

badge and informed the defendant he was under arrest. The defendant stopped his car and as Detective Grant approached, the defendant stated, "you got me." He handed the officer some white pills, later analyzed as containing dilaudid, and a "narcotics kit" (consisting of a syringe, needle, cotton, a vial of water and a spoon), both of which he pulled from his pockets. The defendant was taken to the police vehicle, and as they got into the car, defendant was advised of his right to remain silent and of his " * * right to an attorney." Defendant stated he understood these rights. According to the officers, there was never a threat of punishment nor an offer of reward made to the defendant by them or anyone in their presence—"none whatsoever"—in connection with their dealings with the defendant on the occasions in question.

At the time of his arrest, the defendant informed the officers that he was " * * * pretty strung out, that he had a heavy habit." In the police vehicle, the defendant stated he had forged prescriptions under the name of a "Rita Valli," eight or ten times at numerous drugstores in Tucson to obtain dilaudid, that there was no such person as Rita Valli, and that a prescription pad which he had used was in the trunk of his car. A detective removed a blank prescription pad of a local hospital from the trunk of the defendant's car.

A conflict in the testimony occurs in regard to whether the accused requested "a shot" of dilaudid pills from the officers after his arrest. The defendant testified that at the scene of the arrest he notified the officers he needed to use some of the tablets. The officers testified they could recall no such request but that it was "possible" it was made. The defendant testified that when they arrived at the police station, he requested for a second time some of the tablets of dilaudid and " * * * they told me that that matter would be discussed after we had taken care of the business at hand, going through the search and their asking questions of me." At the police station, the defendant was requested to fill out one of the prescription blanks with a prescription similar to those which the defendant had previously forged, and the defend-

ant complied with the request. This prescription was admitted in evidence during the trial as Exhibit 1, and is strikingly similar to several prescriptions established to be forgeries and admitted in evidence. Other than this damaging admission, there was no other evidence introduced during the trial of any admissions or confessions made by the defendant at the police station, the officers confining themselves to what the defendant said to them at the scene of the arrest.

In connection with the sample prescription given at the police station, the following testimony was elicited from the defendant by his attorney:

"Q [by defendant's counsel] You believed when you filled out the form and your conversation at the detective headquarters that you were going to receive the benefit of getting to use the drugs?

"A I believed that I could and certainly I will say that, and also I had to say that no one said I would to me. There was an intimation that I would.

"Q By their actions?

"A Well, for one thing, the reference 'We will talk about that after we take care of this business at hand.' "

On cross-examination the following came in evidence:

"Q Now, this hope that you had, do you feel that the officer deliberately induced that hope or was it your own desire for a shot that created that hope in your own mind?

"A I would say moreso my own desire. I might be reading something, speaking truthfully, something into there that wasn't there."

The defendant is 47 years of age and according to his own testimony had been arrested previously "innumerable" times. He testified that after the interrogation, while he was being taken to jail, he again asked for some tablets and told the officer he was becoming sick. The officer who took the defendant to jail does not recall such a request, but does recall he saw the defendant in the evening on the day of the arrest and at that time the defendant com-

plained of pains in his stomach and of going "into withdrawals." Subsequently, either that night or the next morning, the defendant was hospitalized because of his withdrawal symptoms and was committed under a mental health type of hearing to a hospital for about ten days. At the hospital he received a "shot" to alleviate his symptoms.

The total length of time elapsing between the arrest of the defendant and his being taken to a jail cell after his interrogation is not pinpointed in the record. However, the entire tenor of the testimony is that this procedure took place without any delay and there was no attempt by the defendant at any time to deny his guilt or to avoid cooperating with the police to ascertain the facts pertaining to the forged prescriptions. The defendant's memory of what took place at the scene of the arrest was demonstrated by his testimony to be clear. His testimony agreed, even as to details (i. e., that the officers stopped him by informing him his tire was going flat and that he thanked the officers for so doing), with that of the police officers, with the exception only of his testimony as to requesting dilaudid pills. There is no testimony that the defendant was suffering withdrawal symptoms until after all admissions and/or confessions admitted in evidence had already been made.

On the basis of the testimony heard, the trial court ruled the admissions and confessions made by the defendant to be voluntary, and permitted the testimony to go to the jury subject to the jury's determination of the voluntariness of the statements made.

■ This case was tried on March 1, 1966, so it is controlled by the decision of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), but not by the decision of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966), as determined by the decision of Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 1882, 16 L.Ed.2d 882 (1966).

Our constitutional law pertaining to the admission in evidence in criminal trials,

both state and federal, of admissions and confessions of the accused has been in seething metamorphosis for many years. See Developments—Confessions, 79 Harv. L.Rev., pp. 935–1119 (March 1966).

Many decisions in this area have indicated that perhaps the Court's primary concern in rendering these decisions is to weigh the public policy in favor of permitting a full judicial inquiry into allegedly criminal activity against an abhorrence of forceful and overbearing police methods, which degrade the entire law-enforcement process. The Court has indicated many times that this weighing of policies would be done on a totality-of-circumstances basis, and that the objective circumstances surrounding a confession would outweigh a trial judge's determination as to the subjective state of the accused's mind at the time of the making of a confession. Among the cases making these points are: Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513, 520–521 (1963); Blackburn v. State of Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); and, Fikes v. State of Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246, 251 (1957).

■ Absence of trickery, cajolery, extended interrogation, overbearing conduct, incommunicado questioning, refusal to permit counsel, and/or any of the other conduct condemned in the myriad [2] of United States Supreme Court decisions in this area prompts us to believe that the confessions and admissions in this case were properly admitted to be weighed by the jury in its quest for the truth.

As previously pointed out, the instant decision is not controlled by Miranda. As we view the uncontested evidence, the procedure here followed satisfies all of the requirements of Miranda with the exception only of the requirement that the accused be notified " * * * that if he cannot afford

2. Spano v. People of State of New York, 360 U.S. 315, 321, n. 2, 79 S.Ct. 1202, 3 L.Ed.2d 1265, 1270 (1959), cites twenty-eight decisions pertaining to coerced confessions admitted in state courts.

an attorney one will be appointed for him prior to any questioning if he so desires." 86 S.Ct. at 1630, 16 L.Ed.2d at 726.

Even in *Miranda*, it is acknowledged:

"Any statement given freely and voluntarily without any compelling influence is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."

86 S.Ct. at 1630, 16 L.Ed.2d at 726.

The trial court is necessarily concerned with mental processes of the accused in its determination of "voluntariness" of a confession, for the semantic label placed upon the critical concept unquestionably suggests an appraisal of the subjective state of mind of the accused. The ascertainment of subjective state of mind is always a delicate fact-finding function. The Supreme Court has never departed from its pronouncement that:

"* * * where there is a genuine conflict of evidence great reliance must be placed upon the finder of fact."

Blackburn v. State of Alabama, 361 U.S. 199, 80 S.Ct. 274, 281, 4 L.Ed.2d 242, 249 (1960).

In the instant action we have a finding of voluntariness rendered by a trial court after hearing detailed testimony as to what occurred, both from the police officers who participated in this arrest and interrogation, and from the accused himself. That this

hearing was not more lengthy does not in our opinion render it ineffective. Thirty-two pages of a total transcript of testimony of ninety-seven pages (excluding that portion of the transcript devoted to jury instructions) were devoted to the separate hearing on the issue of voluntariness to the court, and a substantial portion of the remaining testimony was devoted to the issue of voluntariness tried to the jury. There is no complaint that the trial court unreasonably limited cross-examination or excluded proffered evidence. That the examination was not more extended, we believe is rendered appropriate by objective indications that the accused's clarity of mind, memory and control of his physical faculties were not impaired at the time of his relatively short interrogation, and by the absence of coercive methods used by police officers.

We are not unaware that in State v. Gallagher, 97 Ariz. 1, 396 P.2d 241 (1964), our Supreme Court stated:

"In addition to the above, determination of the voluntariness of these admissions would have to include careful and systematic inquiry into the peculiar resilience to questioning of appellant in the light of both his physical and mental health."

97 Ariz. at 7, 396 P.2d at 245.

We believe that this statement must be read in the light of the totality of circumstances established in *Gallagher*. The lengthy interrogation of Gallagher over a period of many days, including when he was hospitalized for serious illness, raised the framework for the above-quoted statement. A reading of the cases cited in *Gallagher* to support the above quotation, all but one of which [3] are cited in this opinion, will demonstrate "compelling" [4] circumstances that are totally lacking here. We believe that this requirement that there be "* * * careful and systematic in-

---

3. State v. Owen, 96 Ariz. 274, 394 P.2d 206 (1964), reversed a conviction resulting from a trial at which no hearing on voluntariness in the absence of the jury was afforded the accused.

4. From Blackburn v. State of Alabama, 361 U.S. 199, 80 S.Ct. 274, 281, 4 L.Ed.2d 242, 250 (1960).

quiry into the peculiar resilience to questioning \* \* \*" of an accused must be given a reasonable meaning in the light of degree of "questioning" indulged in by police officers. To mandate, in cases such as this, that there be further exploration of the accused's mental processes would be to divert substantial efforts of judicial inquiry to an unrewarding pursuit, plagued by philosophical and psychological uncertainties. As noted in Culombe v. Connecticut, 367 U.S. 568, 605, 81 S.Ct. 1860, 1880, 6 L.Ed.2d 1037 (1961):

> "The notion of 'voluntariness' is itself an amphibian. It purports at once to describe an internal psychic state and to characterize that state for legal purposes. Since the characterization is the very issue 'to review which this Court sits,' Watts v. State of Indiana, 338 U.S. 49, 51, 69 S.Ct. 1347, 1348, 93 L.Ed. 1801 (opinion of Frankfurter, J.), the matter of description, too, is necessarily open here." 367 U.S. at 604–605, 81 S.Ct. at 1880.

There have been great thinkers among us who have proved to their satisfaction that all events are predestined and that free will is a deceiving untruth. The degree to which this particular defendant's willingness to confess might have been affected by the fact that he was "strung out" is a subject, upon which we have no doubt, psychiatrists, psychologists, philosophers and drug users might expound at great length, but, as we conceive it, with little final good being achieved insofar as the administration of justice is concerned.

If more extensive examination is to be mandated by trial courts, whether desired by the parties or not, into the potential for resistance to police questioning because an accused is a drug user, then we see a broad filed for further judicial inquiry. All persons have had experiences which affect, to a greater or lesser degree, their ability to resist giving answers to questions propounded by an authoritative figure. Family and religious training and experiences, both remote in time and recent, may play a critical role in determining whether an accused makes full confession or denies guilt, or remains silent. The admonition of a parent or loved one[5] to tell the truth may be a far more potent influence towards breaking down the will of the accused to deny guilt than any drug, but, we would not conceive it fatal to the inquiry upon the voluntariness issue for the trial court not to institute an inquiry into mental processes set in motion by such an admonition.

We believe that the degree to which trial courts must indulge *sua sponte* in investigation as to the state of the defendant's mind may very well be affected by whether all drugs and/or stimulants were self-administered, as in this case, or were administered to the accused through or by employees or agents of the government while the accused was in custody, as was the case in Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed. 2d 908, 1 A.L.R.3d 1205 (1964), and in Commonwealth ex rel. Gaito v. Maroney, 422 Pa. 171, 220 A.2d 628 (1966).

Though such a distinction has not been spelled out by the Supreme Court, we see a suggestion of such in the Townsend v. Sain opinion. There, the accused had voluntarily taken dosages of heroin at three to five hour intervals, the last such dosage being taken one and a half hours before arrest (83 S.Ct. 745, 9 L.Ed.2d at 777). However, it is only as to the administration of hyoscine (the same as scopolamine, the "truth serum") by a doctor obtained by police officers for Townsend that the Court expresses concern.[6] See Logner v. State

---

5. See Rogers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961), involving a wife's urging the accused to confess, such being arranged at police instigation.

6. I. e., in n. 5, 83 S.Ct. at 755, 9 L.Ed.2d at 783, it is said: "However, whether scopolamine produces true confessions or false confessions, if it in fact caused Townsend to make statements, those statements were constitutionally inadmissible."

of North Carolina, 266 N.C. 238, 145 S.E.2d 867 (1966), cert. denied 384 U.S. 1013, 86 S.Ct. 1983, 16 L.Ed.2d 1032 (1966), involving voluntary intoxication by alcohol, in which opinion the Court adopted a similar view to that expressed here; also see Logner v. State of North Carolina, 260 F.Supp. 970 (M.D.N.C.1966), and Unsworth v. Gladden, 261 F.Supp. 897 (D.Or.1966), which cases appear to take a contrary view to that expressed herein.

■ It should be made clear that it is our view that if the police officers had secured a confession by an implied promise to provide needed drugs, such a confession should, under the clear mandates of the cases cited above, be summarily excluded by the trial court. But, the trial court being satisfied that such was not the case, we see no cause for reversing at the appellate level. Under the defendant's own testimony, all of the essential elements of these crimes were admitted before any "hope" of police-administered dilaudid came into the defendant's mind. There is no suggestion in the record that the accused would have commenced to cover up his involvement if it had not been for some dialogue at the police station. The defendant's frank testimony that this "hope" probably originated in his own wishful thinking, among other testimony, clearly takes this case out of the "compelling" circumstances category and obviates the necessity of a reversal of these convictions on the involuntariness ground.

■ The appellant further contends that a verdict should have been directed in defendant's favor on all counts of the indictment as to which he was convicted on the grounds there was no evidence that El Campo Pharmacy is located in Pima county. Venue in a criminal case may be established by circumstantial evidence. State v. Howe, 69 Ariz. 199, 211 P.2d 467 (1949). In this case all of the prescription blanks used by the defendant show on their face that they are forms of "St. Joseph's Hospital of Tucson" or of "Old Pueblo Medical Group, 1309 East Broadway, Tucson, Arizona." All of the prescriptions are purportedly signed by a Dr. E. F. Felix, a doctor established by the evidence as practicing in Tucson, Arizona. In addition, we have the testimony of one of the police officers to the effect that at the time of his arrest the defendant " * * * readily admitted the fact he had forged eight or ten prescriptions at numerous drug stores in Tucson to obtain Dilaudid." We may take judicial notice that the City of Tucson is located in Pima county. State v. Gordon, 3 Ariz.App. 193, 412 P.2d 875 (1966). We hold that the evidence was sufficient for the jury to find that the offenses charged occurred in Pima county.

■ The defendant complains of the admission in evidence of the "narcotic kit" that was delivered over to the officers at the time of his arrest. Among the charges as to which the defendant was on trial, but as to which the jury rendered a verdict of not guilty, was a charge of unlawful possession of narcotic drugs at the time of his arrest. Under a charge such as this, there must be a union of both act and intent to possess. State v. Ballesteros, 100 Ariz. 262, 413 P.2d 739 (1966). Under the other four charges, the State was required to prove the obtaining of a narcotic drug through the " * * * forgery or alteration of a prescription * * *" A.R.S. § 36–1017. This is a charge that requires proof of *scienter* that the prescriptions used were forgeries. Beasley v. State, 158 Fla. 824, 30 So.2d 379 (1947).

■ At the time the defendant passed the prescriptions in question, the druggists testified he had told them he was obtaining the drug for a friend who was a terminal case of cancer. There is testimony in the record that the narcotic in the defendant's possession could be injected by use of the kit seized. We hold that the possession of this kit by the defendant had some probative value towards the establishment of the necessary criminal intent and *scienter* included in the criminal charges which were on trial. State v. Farrell, 1 Ariz.App. 112, 399 P.2d 915 (1965).

**546**

 The defendant complains that the court refused to suppress any evidence seized at the time of the defendant's arrest on the grounds there was no reasonable cause to arrest the defendant. Prior to the arrest, the arresting officers had personally interviewed two druggists who had taken the forged prescriptions as to which the defendant's convictions pertain. Both druggists had identified the defendant through pictures shown to them by police officers. One druggist was able to give the police officer the license number of defendant's car. We hold that these circumstances justify an arrest of the defendant, A.R.S. § 13–1403, and that the items taken into custody by the officers were properly seized incidental to a lawful arrest. State v. Randall, 94 Ariz. 417, 385 P.2d 709 (1963).

The defendant complains that in an instruction informing the jury as to the nature of "forgery," the court added the words "or deceive" to the following language:

> "Second, the party committing the act must do so with intent to defraud or deceive."

(Emphasis added)

 The defendant was not on trial for forgery, but rather for obtaining narcotics by means of a " * * * forgery or alteration of a prescription of any written order." A.R.S. § 36–1017, subsec. A, par. 2. Subsection A, par. 1 of this statute, under which the defendant was *not* charged, pertains to obtaining narcotics by "fraud, deceit, misrepresentation or subterfuge." While "intent to defraud" is an element of the crime of forgery, A.R.S. § 13–421, we do not believe the legislature intended to incorporate all the elements of that separate crime into the definition of the subject offense. The subject statute is not aimed at the protection of persons from being defrauded of property, but at the misuse of narcotic drugs. Whether the druggist was defrauded or deceived, we hold to be immaterial to the charges made here. So long as narcotics are obtained by a person knowingly using a forged prescription—that

is, a prescription purportedly made out in the name of a person authorized by law to issue prescriptions, A.R.S. § 36–1006, but in fact written by another person without any authority to so act—we hold the particular crime to be complete. Cf. State v. Scarborough, 170 So.2d 458 (Fla.App.1965). The instruction given was more in the defendant's favor than the law entitled him and hence we see no error. State v. Overton, 2 Ariz.App. 376, 409 P.2d 92 (1965).

Judgment affirmed.

HATHAWAY, C. J., concurs.

KRUCKER, Judge (Dissenting):

Although in complete agreement with the resolution of the other questions raised in this appeal, I cannot concur with the resolution of the majority of the issue of voluntariness. It is my belief that the majority has misinterpreted the recent United States Supreme Court confession cases, has virtually ignored the clear mandate of the Arizona Supreme Court, and has refused to consider certain vitally important medical factors which these Arizona cases require to be examined.

Here we have a defendant, admittedly strongly addicted to Dilaudid, a morphine-type drug, asking for it in the police station, and who, on petition of the police, was hospitalized early the next morning, on the advice of a physician, a Dr. Krisanic.

This case is not concerned with police brutality, nor is there any intimation that the police officers did anything questionable or wrong. The sole question is whether the accused, because of his physical condition, could have had an intelligent understanding of his right to remain silent.

I believe that the majority places too narrow an interpretation upon the Supreme Court confession cases. While it is true that a major concern of that Court has been the deterrence of police brutality, that is only part of the picture. See Comment, The Coerced Confession Cases in Search of a Rationale, 31 U.Chi.L.Rev. 313 (1964);

Developments in the Law—Confessions, 79 Harv.L.Rev. 938 (1966). As stated in Johnson v. State of New Jersey, 384 U.S. 719, 729–730, 86 S.Ct. 1772, 1779, 16 L.Ed.2d 882, 890 (1966):

> "Our opinion in *Miranda* makes it clear that the prime purpose of these rulings is to guarantee full effectuation of the privilege against self-incrimination, the mainstay of our adversary system of criminal justice. * * * They are designed in part to assure that the person who responds to interrogation while in custody does so with *intelligent understanding* of his right to remain silent and of the consequences which may flow from relinquishing it. In this respect the rulings secure scrupulous observance of the traditional principle, often quoted but rarely heeded to the full degree, that 'the law will not suffer a prisoner to be made the deluded instrument of his own conviction.'" (Emphasis added)

The fact that *Miranda* turns away from consideration of an accused's mental state at the time of confession in favor of a rigid formula of warnings is not to be construed as holding mental state irrelevant; rather the *Miranda* decision is a recognition that such determinations are difficult to make, and too much subject to the discretion of the trial judge (possibly colored by an awareness of guilt).

The Arizona Supreme Court was vitally aware of the importance of considering the state of mind of the suspect when the *Gallagher* decision (cited by the majority) was written. The majority attempts to distinguish this case on the admittedly bad physical condition of the defendant Gallagher, but overlooks State v. Costello, 97 Ariz. 220, 399 P.2d 119 (1965), wherein the defendant's health is not even mentioned.

It would appear, therefore, that the Arizona cases, to say nothing of those of the United States Supreme Court, mandated the trial judge to probe more deeply in determining whether the condition of Richard McFall was such that he could have made a free and intelligent waiver of his constitutional privilege against self-incrimination. There was no *medical* evidence as to the condition of the defendant during the critical time at which he waived his rights. The State admits that he "was in a condition to be taken advantage of if he was starting withdrawal symptoms."

There are several dangerous aspects of drug addiction to consider. If the defendant was actually under the *euphoric* influence of Dilaudid at the time of arrest, he may have been in no condition to make an intelligent waiver of his rights.

The other side of the addictive reaction, however, may be even more dangerous. It is admitted by the State that the defendant was in a state of acute withdrawal at the time he had to be taken from the jail to the hospital early the next morning. The circumstances are such as to raise a question as to whether this reaction may have set in at the time of arrest and may have been quite severe at the time of interrogation.

It is recognized that in (or just prior to) the beginning of the withdrawal period, the addict-suspect is most vulnerable to police influence. The situation has been well summarized in 8 Am.Jur. Trials § 28:

> "First, the very nature of addiction makes it patent that an addicted suspect in need of drugs will usually do anything, and certainly sign anything, if promised drugs as an inducement. Thus a police promise to one on the verge of withdrawal that a signature will earn a 'shot' is a clear case of an inducement capable of negating voluntariness.

> "Second, a confession signed by one experiencing or on the threshold of withdrawal, or in a weakened post-withdrawal state, would certainly be devoid of voluntariness. The mental state of the suspect-addict during, just prior to, and immediately subsequent to withdrawal is below the rational level inferably necessary to support a confession under the due process clause."

The mental clarity necessary to understand the concept of a constitutional right is significantly greater than that required to be a mere reporter of events. See Comment, Admissibility of Confessions and Denials Made Under the Influence of Drugs, 52 Nw.U.L.Rev. 666, 676 (1957). Certainly no less is required under the federal standard that the waiver of a constitutional right be an "intelligent" one. See, e. g. Westbrook v. Arizona, 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429 (1966); State v. Westbrook, 101 Ariz. 206, 417 P.2d 530 (1966).

And yet, the inquiry cannot stop here, for as has been stated in the most recent Supreme Court case to deal with the problem of confessions elicited by the use of drugs, Townsend v. Sain, 372 U.S. 293, 324, 83 S.Ct. 745, 763, 9 L.Ed.2d 770, 792 (1963) (Justice Goldberg concurring):

"The petitioner may have been fully aware of what he was doing in confessing and may have suffered no loss of memory, but that is not the issue. The crucial question, and the measure of evidentiary propriety under the Constitution, is whether the drug—whatever label was or was not affixed to it—so overbore the petitioner's will that he was unable to resist confessing. Whether or not he was conscious of what he was doing, the petitioner could, because of the drug, have been wholly unable to stop himself from admitting guilt."

The most recent case on the general subject of confessions made under the influence of drugs (and liquor) is Logner v. State of North Carolina, 260 F.Supp. 970 (M.D.N.C. 1966). In this case, the Federal District Court vacated the conviction of a prisoner who had been arrested while under the influence of liquor and amphetamine. The court, in Logner v. State of North Carolina, supra, quoted Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961), in which it was stated:

"No single litmus paper test for constitutionally impermissible interrogation has been evolved * * * [t]he ultimate test remains * * * the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. * * * The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession."

260 F.Supp. 976

The district court stated further:

"By the applicable standards, a confession is not voluntary simply when it is shown that it is not produced by a promise or threat. A confession is voluntary in law if, and only if, it is voluntarily made."

260 F.Supp. 976

* * * * * *

"The petitioner in his condition was incapable of acting knowingly or intelligently. Once in custody and when the investigation had focused on the petitioner as the accused, at that moment a cloak of constitutional rights enveloped the petitioner. This cloak could only be removed by some affirmative action on the part of the petitioner and at the time the petitioner was incapable of any such affirmative action. * * * To waive his constitutional rights, the petitioner must be capable of doing so in a voluntary, knowing, and intelligent manner. The petitioner was not in that position."

260 F.Supp. 977

The same reasoning is equally valid whether the drug itself breaks down the will or whether the pains (or simple anticipation of pains) resulting from the withdrawal of the drug render a person willing to waive his constitutional rights.

I would not hold as a matter of law that the defendant could not have made a constitutionally valid waiver of his privilege against self-incriminaiton. Rather, I would hold that in this case, where the defendant's

addiction at the time of interrogation is admitted, the trial judge, *upon satisfactory evidence,* must, as stated in *Gallagher,* make his

> "careful and systematic inquiry into the peculiar resilience to questioning of appellant in the light of both his physical and mental health."
>
> State v. Gallagher, 97 Ariz. 1, 7, 396 P.2d 241, 245 (1964)

It is only after this inquiry has been made, that the judge can properly determine: first, whether the defendant was in a condition so that he could make a knowing, intelligent waiver; and second, if this test is satisfied, whether any "direct or implied promises, no matter how slight," were made by the police which reasonably caused the defendant to waive his constitutional rights.

The scope of a trial judge's duty is aptly described in the following excerpt from Gitelson and Gitelson, A Trial Judge's Credo Must Include His Affirmative Duty To Be An Instrumentality of Justice, 7 Santa Clara Lawyer 16 (1966):

> "The fundamental duty 'to do justice' requires the trial judge 'to be most viligant [sic] and vigorous in protecting individuals, as well as minority and majority groups, against encroachment upon their fundamental liberties,' though no objection be made by counsel or the right to be unknown to the litigants or their counsel. Whether the proceeding be civil or criminal, the protection of such fundamental rights as life, liberty and property is dependent upon procedural due process. The trial judge's duty to ensure this protection is not delegable to either counsel or appellate tribunals."

For the foregoing reasons, I would reverse the judgment of the trial court and remand the case for a new trial to provide a more thorough and complete inquiry into the voluntariness of the confession.