278 P.2d 423

**STATE of Arizona, Appellant,**

**v.**

**Mrs. Jean CHASE, Appellee.**

**No. 1053.**

Supreme Court of Arizona.

Dec. 28, 1954.

Ross F. Jones, Atty. Gen., Earl E. Weeks, Asst. Atty. Gen., for appellant.

Douglas Peterson, V. L. Hash and Robert Bernstein, Phoenix, for appellee.

PHELPS, Chief Justice.

On December 1, 1953, Jean Chase, defendant-appellee herein, was convicted in the superior court of Maricopa County of murder in the first degree by a jury of her peers which fixed the punishment at life imprisonment in the state penitentiary at Florence. On the 16th day of December, 1953, the trial court on motion of defendant

for a new trial granted said motion from which order the State of Arizona appeals.

The court declined upon request to state the ground upon which it ordered a new trial. The State therefore has undertaken to show that the court was not justified in granting a new trial upon any ground stated in the motion. It has presented six assignments of error for our consideration covering in substance the grounds stated in the motion for a new trial.

We stated in State v. White, 56 Ariz. 189, 106 P.2d 508, that the granting or denying of a motion for a new trial is discretionary with the trial court and will not be reversed by this court unless it affirmatively appears that there has been an abuse of discretion. We said in State v. Duguid, 50 Ariz. 276, 72 P.2d 435, 436, that if there is any fair or just reason for the order granting a new trial, it will not be disturbed, but pointed out that the discretion exercised must be a legal and not an arbitrary discretion and must be exercised in a legal manner. The court proceeded to say:

"* * * When the object in granting a new trial is to promote justice and protect the innocent, and the record so discloses, the court's discretion is properly exercised. But if upon an examination of the record it appears no mistake of law or fact occurred in the trial, and that the evidence fully sustains the conviction, it is an abuse of discretion to grant a new trial. * * *"

There was a great deal of irrelevant testimony received in evidence during the course of the trial in this case to which no objection was made by either counsel for the State or the defense, and on occasions the court failed to rule on objections made involving testimony offered both by the State and by the defense.

We believe, however, that it will be unnecessary to consider in this opinion the question of whether error was committed in receiving or rejecting evidence as we propose to base our conclusions upon the question raised in the State's assignment No. 6, to wit, that:

"The lower court in granting a new trial on the ground that the evidence of the state wholly failed to establish by material evidence deliberation, premeditation and malice aforethought."

Without unduly extending this opinion suffice it to say that in order to sustain a verdict of murder in the first degree in this case the evidence must be of such character as to convince the jury beyond all reasonable doubt that the killing was perpetrated not only with malice aforethought but with deliberation and premeditation. These elements are susceptible of proof by circumstantial evidence, so long as such evidence is sufficient to establish the fact of their existence beyond a reasonable doubt. 41 C.J.S., Homicide, § 317, page 30 and in 40 C.J.S., Homicide, § 192, page 1091, it is said that:

"Proof of the mere fact of killing, or of killing with a deadly weapon, does not raise a presumption of premeditation or deliberation, so as to make the offense murder in the first degree under statutes dividing murder into degrees. However, the premeditation or deliberation which is essential for this purpose may be inferred from the facts and circumstances of the killing."

See also Moore v. State, 65 Ariz. 70, 174 P.2d 282.

The specific questions presented here which we propose to consider are:

1. Does the testimony in this case compel a finding that the killing was wilful, deliberate and premeditated?

2. Did the trial judge abuse his discretion in ordering a new trial?

If the first question is answered affirmatively the second question must be answered in like manner. It is the duty of the court under the circumstances to review all of the evidence in the case and to determine therefrom whether the State proved beyond a reasonable doubt that the crime of murder was committed with malice aforethought and with deliberation and premeditation.

The facts are, as disclosed from the evidence, that defendant and decedent were husband and wife and had been such since 1948. Defendant was married at the time she met decedent and procured a divorce from her first husband at decedent's request and also at his expense. Apparently there never existed in the home an atmosphere of congeniality or tranquility. During the period since their marriage they lived separate and apart at times which according to the evidence was due to decedent's unceremonious absence from their domicile and divorce was discussed on different occasions. Defendant had planned a divorce in New Jersey where she resided as soon as the law would permit and decedent had instituted divorce proceedings in Phoenix which were later dropped. He had been in Arizona several months before she knew of his whereabouts. She testified that he invited her to come here purportedly to reconcile their differences but after her arrival he disclosed that he invited her here to place her in a position of condoning any previous conduct of his that would furnish grounds for divorce. She further testified that he told her she was crazy and that he was going to have her committed to the insane asylum. The latter statement is corroborated by the testimony of a Mr. Barnes, deputy sheriff assigned to mental health unit, who testified that decedent had consulted him concerning steps to be taken to have her committed and that a petition was left with him on August 31 to be filed later upon request by decedent. He stated he was going on a vacation next morning alone and upon his return he would come back in.

On September 1st decedent and defendant left Phoenix in their automobile for

a two weeks' vacation at Las Vegas and Hollywood after which it was understood that she would drive the car back to New Jersey to visit her family and to get her clothing. They remained at Las Vegas a week during which time they engaged in various games of chance until they had exhausted all of their funds. Defendant cashed a bond to take care of their expenses via Hollywood to Phoenix.

Defendant purchased a 25-caliber Barretta automatic pistol in Las Vegas stating to the clerk with whom she dealt that she wanted the gun to take with her on a trip by auto from Phoenix to New York City. The next day she returned and asked the clerk to show her how to shoot the gun and was informed she could go out on the desert and practice without violating any law. The clerk showed her how to place the cartridges in the clip and how to shoot it.

On the return trip from Hollywood to Phoenix apparently there had been no quarrelling between them until after they left Wickenburg when defendant testified he threatened her. Just what brought this outburst about was never explained except that she stated she told him she was going to report to the police when she got to Phoenix that both she and he each had a gun. Why such a statement on her part would cause decedent to threaten her life is difficult to understand. Defendant seemed at all times to evade direct answers to questions proposed by counsel for the State but found no difficulty in understanding and answering with clarity questions proposed by her own counsel.

The conversation concerning her intention to report the fact that she and he both owned pistols took place about 20 miles southeast of Wickenburg. It was at that point, she testified, that he threatened to knock her out and stated everybody would think she committed suicide. The witness stated with respect to this incident that:

"When Roger said he was going to knock me out and everybody would think his wife committed suicide and nobody would blame him, he pulled to the side of the road and he tried to get —he shoved me against the car, tried to get my gun out of the glove compartment and I fell against the dashboard —I didn't let him have it, so he got out of the car and he came around the car at me. In the meantime, I got the gun out of the glove compartment and as I was getting out of the car, the gun went off, and I know I was screaming and I was asking Roger, 'Please don't kill me' and the next thing I knew when I asked where I was, they said I was in the hospital. I never saw Roger except when he came around my side of the car.

"Q. What did he say when he came around? A. He was going to knock me out and kill me and everybody would think—you see, he said he had told people that I tried to take my life

and I wanted to commit suicide and everything, so everybody would think my wife committed suicide, nobody would blame him."

Doctors McGrath and Duisberg testified that her claimed inability to recall the actual shooting was due to a form of involuntary amnesia. Both of these gentlemen are specialists in neurology and psychiatry. Doctor McGrath said that such a condition is attributed to what is called diversion hysteria which he defined as being an involuntary or unconscious or protective mechanism of the mind against the shocks or the relaxing of emotions which would be painful to consciousness.

The evidence does not show whether decedent came around in front of the car or around the rear end. The cartridges which were ejected from the gun were located "one in the car in the farther right hand corner of the floor board, one to the rear of the right wheel, one a little further away from the car and to the rear more so of the right wheel, another one a little further back than the second one and one further back of the car, probably eight or ten feet at the most."

It was further testified that when the cartridges were automatically ejected from the gun that they would fly over the shoulder or head of the person using the gun and fall a few feet to the rear of the person. A test showed, however, that some of the cartridges struck the person shooting the gun on the shoulder and fell in front of him. Decedent's body was found lying in the middle of the highway face down and his head pointing in the opposite direction from his car. No bullet entered the body from the rear. All of the bullets discharged from the gun either entered the body in the front or side thereof.

Defendant was standing in the middle of the highway trying to stop someone when Mr. and Mrs. Lay arrived at the scene. They were the first persons to arrive after the tragedy. Mr. Lay directed Mrs. Lay to sit in the car with defendant and to flicker the lights in the car as fast as she could in order to stop traffic until he could get aid. During the time defendant sat in the car with Mrs. Lay she told her that "I wanted a baby and he didn't." "I had wished him dead a million times, but I didn't, I really didn't."

■■ The above statement of facts developed on the trial of the case constitutes all of the evidence bearing upon the question of premeditation and deliberation, and we are of the opinion that the trial judge was justified in finding that it falls short of establishing their existence beyond a reasonable doubt. The fact that the testimony shows that deceased stopped the car in which they were riding along the roadside at 1:00 o'clock in the morning at a point considerably removed from habitation after threatening to knock defendant out and coming around to her side of the car materially weakens any inferences which

might otherwise have been drawn from the purchase of a gun in Las Vegas which she used to shoot him and her statement that she had wished him dead a million times, etc. The trial judge had the right to weigh the evidence and it is our view that he did not abuse his discretion in granting the motion for a new trial. General Petroleum Corp. v. Barker, 77 Ariz. 235, 269 P.2d 729.

The order of the trial court is affirmed.

STANFORD, UDALL and WINDES, JJ., concur.

LA PRADE, J., dissents.