396 P.2d 241

**STATE of Arizona, Appellee,**

v.

**Lee Roy GALLAGHER, Appellant.**

No. 1216.

Supreme Court of Arizona.

En Banc.

Oct. 28, 1964.

Robert W. Pickrell, Atty. Gen., Merton E. Marks, Asst. Atty. Gen., Phoenix, for appellee.

Lewis, Roca, Scoville, Beauchamp & Linton, by John J. Flynn, Phoenix, for appellant.

LOCKWOOD, Vice Chief Justice.

The appellant, Lee Roy Gallagher, was the defendant tried in Maricopa County Superior Court on a charge of murder in the first degree. He was found guilty by a jury which fixed his punishment at death. He appeals his conviction.

Defendant was stopped by Phoenix police at approximately 1:45 A.M. on November 30, 1960. He was driving at about 25 m. p. h. in a 45 mile zone. The arresting officer testified that as defendant left his car he noticed what appeared to be a "large blood stain * * * on his shirt." Defendant, under the influence of alcohol according to some police testimony, was then briefly questioned as to the presence of that stain and provided contradictory responses such as that he had cut his finger and that he had been the victim of a street brawl. Unable to secure corroboration of either of these assertions the police then

took defendant to the Phoenix police station in order to secure a drunkometer test. Defendant's removal to the Phoenix police station took place between 2:15 and 2:30 A.M. He registered .18 on the drunkometer test and was also swaying and having "trouble with his bowels."

Throughout the day appellant remained at the Phoenix police station. No attempt was made to take him before a magistrate as required by A.R.S. §§ 13–1417, 13–1418 until December 8, 1960, nine days after his arrest. At no time during this period was appellant charged with any crime.

About 11:00 A.M., November 30, 1960, while defendant was in custody, two workmen picking up a load of gravel in the desert area south of Washington Street at about 56th Street and the railroad tracks in the city of Tempe, observed the dead body of a woman lying a short distance off the road. The woman was later identified by fingerprint comparisons as Pauline Stephens. Police Lieutenant Gordon Selby of the Phoenix Police Department was the first officer to arrive on the scene and observed tire tracks and shoe prints about thirty feet south of the body. Immediately noticeable were shoe heel imprints in the soil near the body.

Since the body was within the city limits of Tempe, the police department of that city was notified. Captain Frank Adams of the Tempe Police Department arrived on the scene and had the body, tire tracks and shoe prints photographed. By 11:30 P.M. of November 30, defendant was undergoing interrogation by three Phoenix police officers. Admissions were secured to which we will refer later.

Shortly after midnight of December 1, 1960, the automobile in which defendant had been apprehended and which had been towed to the Tempe Police Station from Phoenix was opened and examined by Tempe police officers. The car contained, among other things, men's and women's clothing, a knife inside a scabbard, an empty scabbard, a letter and a tablet of paper. On December 1, defendant was transferred to the Tempe jail shortly after 5:00 P.M., and was subjected to renewed interrogation. On the day of the transfer, a justice of the peace issued a warrant for the arrest of the defendant, still in custody upon mere suspicion, on the charge of murder in the first degree. Questioning of the defendant by police officers, admittedly addressed to the now pending charge of murder, was put on a daily basis.

Defendant was without assistance of counsel or friends throughout all of these inquisitorial proceedings. He was questioned at one time—on December 1—in the presence of a news reporter. We note at this state that a news summary of highly incriminating statements attributed to the

**4**

defendant appeared in the local press before trial.[1]

The interrogation of defendant was renewed by various police officers on December 2. Defendant was still without the assistance of counsel or friends through the ensuing inquisition. Thereafter the pattern of interrogation to which defendant was subjected at the Tempe jail is best summed up in the words of Captain Adams who had been in charge of the investigation:

"Well, I talked to Mr. Gallagher probably every day that he was there of the nineteen with the exception of possibly four days."

The defendant's daily food ration at Tempe jail consisted of one sandwich and coffee for breakfast and two sandwiches for his evening meal. When interrogated, however, the defendant would receive such food as hamburgers, milk-shakes and candy bars at the hands of the interrogating officers. There was no indication of representation of defendant by counsel until December 8, 1960, the day of the preliminary hearing.

On December 12, 1960, the County Attorney of Maricopa County filed an information against the defendant, charging him with the willful, unlawful, and felonious killing, with deliberate and premeditated malice, of Pauline Stephens. Police continued their interrogation of defendant in the manner described above after the information was filed.

Diagnosed first as a victim of pneumonia and then of tuberculosis, defendant was transferred to the Maricopa County Hospital before trial. However, interrogation by investigating police officers did not cease. Police Officer Peterson, accompanied by Captain Adams, visited defendant at the county hospital for further questioning. The investigating officers did not secure permission for this visit, either from the attending physicians or from defendant's counsel. They told defendant, who was then seated on his hospital bed, that their visit was not for the purposes of investigation but was solely on a friendly, social level. Damaging admissions were again secured which were later received in evidence at the trial.

The admissions used against defendant, and secured in the course of the police interrogation can be summed up as follows: Defendant admitted that he had lived with the deceased. He admitted that he had camped out on the night of November 28, 1960, at the place where the body was found. He also admitted that the car and boot tracks at the scene were his. He identified a letter found in the car as one which he had written to his mother but

1. The problem of this type of situation is discussed in Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). Whether the Rideau doctrine is applicable to the instant situation should be considered upon retrial.

had not mailed. The letter was admitted in evidence solely upon his admission of authorship and read (verbatim) as follows:

"I may have to send some of my colths to you, Mom. I am so mess up, I am asking you what I should do. Send my mail to Gen. Del. Phomix, Airz.

"I'll stay here as long as I can but I got to get out, before I do something to her. Its hard to take. I don't know what I am going to do. I am sick and can't work, but if I don't get the money to get out of here on I am going to hurt Pauline. I don't want to, but look like she is going to push me in to it. So I got to get the money to get out of here on, before I get mess up. Mom I don't know what to do, I have no car, please help me all you can. I need help more than I ever needed it before. Please write soon, I'll be waiting."

Some of the most damaging admissions, as recounted by Captain Adams, were secured in the hospital room. Captain Adams testified:

"I remember a part right now I might bring out. I asked Mr. Gallagher if this was his car.

"'Yes,' he said it was his car. And he said that he had bought it up in Washington; and I called his attention to the fact that it was registered to Pauline, and he said, 'Yes, that is true, it is registered to Pauline, but it is still mine. I bought it and it is registered to her, but I am paying for it, and I still owe some money on it.'

"The witness—I mean the defendant asked me, he said, 'Did you find any blood in the car?' And I said, 'I believe so.' And he said, 'You will also find some in the back seat, then.'

"I said, 'Gallagher, I didn't say where I found the blood.'

"'Well,' he says, 'It doesn't make any difference, you will find some in the back seat anyway.'"

■ All of these admissions were received into evidence at the trial without a hearing out of the presence of the jury as to their voluntary character and the specific circumstances under which they were secured. When police officer George Christian, the first prosecution witness testifying as to admissions, was first asked by prosecuting counsel to testify as to one of defendant's interrogations, defendant's counsel objected on the ground:

"that not one question has been asked this witness as to whether or not any promises were made or threats. * * * We submit there has been absolutly no foundation laid for anything in the nature of an admission."

The court, proceeding upon the explicit assumption that the constitutional safe-

guards applicable to confessions were inapplicable to admissions, refused to grant a hearing out of the presence of the jury as to the voluntary character of the admissions. The trial court declared:

> "Of course, there is a distinction between an admission and a confession. If it is the latter, a proper foundation would have to be laid."

Upon receiving the specific assurance of the prosecuting counsel that the prosecution was "not offering any confession * * * in this case", the court overruled the objection of the defense, and allowed the introduction of the admissions.[2] All admissions were received subject to that objection. We note fundamental error in the reception into evidence of all of the admissions against interest used against defendant. The critical character of the admissions becomes apparent from the fact that without them the evidence available to the prosecution would not have justified a first degree conviction. Confessions, statements, exculpatory or otherwise, as well as admissions against interest, produced by police practices barred by the Constitution, are all subject to exclusion, State v. Owen, supra; Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963).

As we said in State v. Owen, supra:

> "We hold, * * * that in Arizona when a question is raised as to voluntariness of a statement constituting either admissions against interest, exculpatory or otherwise, or a confession, it must be resolved by the judge outside the presence of the jury. If he determines it was involuntary, it will not be admitted. If he determines it was voluntary, it may be admitted. Evidence tending to contradict the voluntary nature of the statement or confession may be admitted, and the jury may, as under the Massachusetts rule, then in effect disagree with the judge, and reject the confession." 96 Ariz. at 277, 394 P.2d at 208.

A determination as to voluntariness no longer hinges upon a showing of overt threats or physical duress—although the evidence of tubercular illness in the case at bar may even suggest elements of the latter. We recognize "that the blood of the accused is not the only hallmark of an unconstitutional inquisition." Blackburn v. Alabama, 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242 (1960).

We are dealing with two classes of admissions—those obtained by interrogation at the police stations and those ob-

---

2. At the time of the trial judge's ruling, the ruling was correct. State v. Romo, 66 Ariz. 174, 185 P.2d 757 (1947). Now there is no distinction in this respect between an admission and a confession, State v. Owen, 96 Ariz. 274, 394 P.2d 206 (1964).

tained at the hospital. As to the latter they are not admissible as a matter of law.

" 'Any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime.' * * *

"This view no more than reflects a constitutional principle established as long ago as Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, * * *." Massiah v. United States, 377 U.S. 201, 205, 84 S.Ct. 1199, 1202, 12 L.Ed.2d 246 (1964).

In addition to the above, determination of the voluntariness of these admissions would have to include careful and systematic inquiry into the peculiar resilience to questioning of appellant in the light of both his physical and mental health. See State v. Owen, supra; Massiah v. United States, supra; Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Blackburn v. Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957).

Further reversible error occurred when Police Officer Christian, a witness for the prosecution, was permitted to suggest the existence of a criminal record on defendant's part. After having testified as to admissions by appellant, the witness was asked by the county attorney if he were "trying to remember something else" and the witness replied in the negative. The county attorney persisted:

"Did you hear any further conversation?"

The witness replied:

"The question was asked by Captain Adams if the defendant had ever been in jail, and the defendant * * *".

The county attorney responded with:

"We will come to that question * * *".

The defense moved for a mistrial and the motion was denied. This testimony conveyed to the jury that the defendant had a record of prior crimes. State v. Jacobs, 94 Ariz. 211, 382 P.2d 683 (1963); State v. Byrd, 62 Ariz. 24, 152 P.2d 669 (1944). The testimony was not offered for purposes of impeachment or for any of the usual exceptions to the rule excluding the record of prior crimes and thus was prejudicial error. State v. Gortarez, 96 Ariz. 206, 393 P. 2d 670 (1964); State v. Kellington, 93 Ariz. 396, 381 P.2d 215 (1963). The fact that the answer was not directly responsive to the

question of the prosecutor does not make the error less prejudicial. State v. Smith, 96 Ariz. 150, 393 P.2d 251 (1964).

What we have said requires the case be reversed for a new trial. However, for the guidance of the trial court we will discuss other errors.

■ Appellant asserts error in the admission and/or display to the jury of numerous items of evidence. Illustrative of his allegations was the offer in evidence—subsequently refused—of a jar of putrefied blood which was permitted to be displayed and opened in open court and which spilled part of its contents on the hand of a prosecuting witness. Similarly illustrative was the reception in evidence of a long knife and two empty scabbards found in the appellant's car. None of these items were properly connected to the crime in question and had nothing to do with the appellant's guilt or innocence. They should not have been admitted or displayed.

■ Late in the trial of the case, appellant's counsel moved for a mistrial on the ground that a spectator had communicated hostile views to the jury in a loud tone of voice and had received a sympathetic response from one woman juror. He expressed the views that it would save the state money to gas all murderers; that "Anybody that messes around with chippies for years, ought to be gassed"; mentioned murder trials of notoriety; and called on J. Edgar Hoover as witness for the truth of his views and comments. Mistrial is mandatory in any case in which outside parties have put even a single juror under significant pressure, notwithstanding the propriety of their motives. Remmer v. United States, 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1956).

■ In addition a witness for the prosecution was unable to identify defendant—sitting masked by court order—at counsel table and was permitted to make his identification on the basis of a photographic exhibit which had at no time been admitted in evidence. It is elementary that any such method of identification was improper.

Reversed and remanded for a new trial.

UDALL, C. J., and STRUCKMEYER, BERNSTEIN, and SCRUGGS, JJ., concurring.