509 P.2d 203

**STATE of Arizona, Appellee,**

v.

**Scott R. BRIERLY, Appellant.**

**No. 2177.**

Supreme Court of Arizona,
In Banc.

April 16, 1973.

Gary K. Nelson, Atty. Gen., by Paul J. Prato, Former Asst. Atty. Gen., and Ronald L. Crismon, Asst. Atty. Gen., Phoenix,.

and Howard L. Fell, Asst. Atty. Gen., Tucson, for appellee.

DeConcini & McDonald by J. Wm. Brammer, Jr., and Barber, Haralson, Giles & Moore by Charles M. Giles, Tucson, for appellant.

HAYS, Chief Justice.

Scott R. Brierly was charged with the murder of Bettie Frances Stevens in violation of ARS §§ 13-451, 13-452 and 13-453. He was tried by a jury which, on April 6, 1970, returned a verdict of guilty of first degree murder and set the penalty of death. On April 20, 1970, defendant's motion for a new trial was heard and denied and the trial court sentenced him to death. Brierly appeals from the denial of his motion for a new trial and from the verdict of guilty and the sentence of death.

The defendant presents twenty-nine issues on appeal, many of which necessitate a careful review of specific facts. The initial summary of the factual context of the case will, therefore, be brief.

Will Stevens, the husband of the victim, returned to Tucson from a business trip in the early morning hours of September 27, 1969. After securing his airplane, he left the airport and drove toward his Tucson home. He stopped at the Cliff Manor Motel on the way when he saw his wife's car parked in the parking lot. He found his wife in another car with another man. Bettie Stevens got into her husband's car and they went home where they argued. She had been drinking. They decided she would go back to the Cliff Manor Motel and get a room. Will Stevens drove his wife to the motel, and informed her that he had taken her car keys and her checkbook. At the motel he watched his wife go into the lobby and then returned home to call a friend to help him pick up his wife's car. They picked up the car and returned to the Stevenses about 3:30 a. m. to have a drink.

When Bettie Stevens asked the night clerk about her reservation at the motel, she was told that she had none. With that information, she tried to make a phone call but became discouraged trying to get the coins in the slot, cried, and left the building. She was found later that morning, lying naked on the desert, dead of four gunshots in the head.

Scott Brierly, age 21, lived in Oracle but was in Tucson on business on September 26, 1969. He spent the early part of the evening at the Maverick in Tucson. He left the Maverick about 1:00 a. m. on the 27th and went to Wild Bill's Big T, an after-hours bar, where he stayed until shortly before 3:00 a. m. Brierly was stopped by two Tucson police officers about 3:15 a. m., when they noticed a headlight out on his pickup. He was arrested and charged with murder as a result of the evidence which came to light during the course of this routine traffic violation stop.

I. Did the trial court err in denying the motion to suppress the evidence of Brierly's truck, its contents and his personal effects because of the State's failure to secure a search warrant prior to the searches and seizures?

The testimony shows the following factual situation: Upon being stopped by Deputy Sheriff Max Clark and Reserve Deputy Sheriff Eddie Charles Mahon, Brierly got out of the cab of his truck and walked toward the rear of the truck to the police car. The defendant had a cut over his right eye from which he was bleeding slightly. In addition, the defendant wore no shirt, and Deputy Clark testified he observed "a large quantity of what appeared to be blood on the defendant's chest, arms and hands." Deputy Clark introduced himself and the defendant explained that he had been in a fight at Wild Bill's Big T. Deputy Mahon observed that Brierly was "covered with what appeared to be blood from the waist up, on his hands, arms and face." While Deputy Clark talked to the defendant, Deputy Mahon went to the driver's side of the pickup and proceeded to the front to check out the headlight. On the way, Mahon flashed his light into the bed of the pickup where he saw a pile

of "rags," a pair of shoes and a handbag. He proceeded on to the open door of the truck and shone his light into the cab where he saw blood and a six-pack of beer. He called Deputy Clark who told Brierly to sit by the right rear of the truck. The two men then lifted up the bloody rags which, upon examination, turned out to be a dress and a bra-slip. The deputies then asked Brierly if he knew a "Bettie Stevens," the name they found on a card in the handbag. He said "No."

Deputy Charles Shinberg arrived and he and Clark again looked in the cab of the truck. Clark noted two inches of a dagger handle protruding from beneath the front seat. The articles from the bed of the truck and the dagger were seized.

 The fourth amendment to the United States Constitution protects the people from "unreasonable searches and seizures" and provides that no search warrants shall issue except for probable cause. In the instant case, the "plain view" doctrine of *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), provides the relevant exception to the warrant requirement. *Coolidge* provides that:

> What the "plain view" cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the warrantless seizure. Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the "plain view" doctrine may not be used to extend a general exploratory search from one object to another until

something incriminating at last emerges. 403 U.S. at 466, 91 S.Ct. at 2038.

The headlight provided the initial reason for the officers' lawful intrusion and, in light of the defendant's bloody condition, they immediately realized that the bloody apparel and the dagger were evidence. The seized items were in "plain view" and the items were discovered inadvertently while the deputies were justified in being beside the truck. The fact that the flashlight was necessary to provide enough light to see into the truck is irrelevant: the use of a flashlight is comparable to the use of a searchlight, a marine glass or a field glass, and is not prohibited by the fourth amendment. *State v. Loyd*, 92 Idaho 20 at 24, 435 P.2d 797 at 801 (1967). *See* United States v. Lee, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927).

 After finding Mrs. Stevens' bloody possessions and the dagger in the defendant's truck, Officer Shinberg most certainly had probable cause to believe a crime had been committed and therefore had probable cause to search the truck further. Under *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), automobiles and other vehicles may be searched without a warrant in circumstances which would not justify a search of an office or a house, because of the mobility of the vehicle. The gun and holster found by Shinberg under the seat of the cab were clearly admissible under *Carroll*.

 Brierly also contests the search of the pickup at the station house several days later, as well as the search of the vehicle by vacuuming. Under *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) the Court set forth its reasons for holding that a later station-house search under the present circumstances is valid: The truck

> [c]ould have been searched on the spot when it was stopped since there was probable cause to search and it was a fleeting target for a search. The probable-cause factor still obtained at the station house and so did the mobility of the

car. . . . 399 U.S. at 52, 90 S.Ct. at 1981.

■ Finally, the defendant urges that the search and seizure of his clothing and belongings at the jailhouse was in violation of the fourth amendment as interpreted by Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), a case which limits warrantless searches incident to arrest. We cannot agree. *Chimel* limits searches incident to arrest to the area of the defendant's "person and the area from within which he might have obtained either a weapon or something that could have been used as evidence against him." 395 U.S. at 768, 89 S.Ct. at 2043. The very clothes Brierly wore were bloody and were evidence against him.

II. Does the Arizona procedure in capital cases whereby the trier of fact determines both guilt and punishment in a single verdict violate the sixth and fourteenth amendments of the Constitution?

■ Defendant argues that allowing the trier of fact to determine both guilt and punishment violated his Constitutional rights because it effectively prevented him from presenting, during the trial, evidence in mitigation of sentence. The United States Supreme Court has spoken on this precise issue in Crampton v. Ohio, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971):

> The Constitution requires no more than that trials be fairly conducted and that guaranteed rights of defendants be scrupulously respected. From a constitutional standpoint we cannot conclude that it is impermissible for a State to consider that the compassionate purposes of jury sentencing in capital cases are better served by having the issues of guilt and punishment determined in a single trial than by focusing the jury's attention solely on punishment after the issue of guilt has been determined. 402 U.S. at 221, 91 S.Ct. at 1474.

■ III. Does the Arizona procedure, allowing capital trial juries absolute discretion to impose either the penalty of death or life imprisonment upon one convicted of first degree murder, deny that person due process of law as guaranteed by the fourteenth amendment?

We find the following language in McGautha v. California, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971) to be dispositive of the issue:

> In light of history, experience, and the present limitations of human knowledge, we find it quite impossible to say that committing to the untrammeled discretion of the jury the power to pronounce life or death in capital cases is offensive to anything in the Constitution. 402 U.S. at 207, 91 S.Ct. at 1467.

IV. Must the sentence of death be set aside because of the trial court's alleged error in excusing for cause various jurors in violation of the dictates of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)? Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and Stewart v. Massachusetts, 408 U.S. 845, 92 S.Ct. 2845, 33 L.Ed.2d 744 (1972), which hold the death penalty unconstitutional, renders this issue moot.

V. Did the lower court err in admitting State's Exhibit No. 3, a dagger?

Defendant argues that no materiality was established and that any probative value was outweighed by the prejudice created by the admission of the dagger into evidence.

■ The dagger in question is that which was found sticking out from under Brierly's front seat as discussed in Section I, *supra*. Appellant cites the following language in State v. Gallagher, 97 Ariz. 1, 396 P.2d 241 (1964), as authority for his position that the admission of the dagger was reversible error:

> Appellant asserts error in the admission and/or display to the jury of numerous items of evidence. Illustrative of his allegations . . . . was the reception in evidence of a long knife and two empty scabbards found in the appel-

lant's car. None of these items were properly connected to the crime in question and had nothing to do with the appellant's guilt or innocence. They should not have been admitted or displayed. 97 Ariz. at 8, 396 P.2d at 245.

It is unclear from a reading of *Gallagher* whether the court held the admission of these items to be reversible error. In the instant case, the dagger was found with the pistol (the alleged murder weapon) and there was testimony that it could have been used to produce the cuts on the victim's head. The dagger was, therefore, "properly connected to the crime in question," *Gallagher, supra,* and its admission into evidence was not error.

VI. Did the lower court err in admitting two photographs of the victim (Exhibits Nos. 30 and 31), over objection?

■■■ Defendant contends that the two photographs in question were unduly gruesome and prejudicial and that the subject matter had been adequately portrayed by other evidence. He cites State v. Makal, 104 Ariz. 476, 455 P.2d 450 (1969), to support his contention that the admission of the photographs was reversible error. We note upon reading *Makal,* which also dealt with photographs of the dead victims, that the only issue there was Makal's sanity. The court in *Makal* stated that "[w]here as here there was substantially no controversy [that the defendant committed] . . . the offenses, there was no significant reason for their admission into evidence." 104 Ariz. at 478, 455 P.2d at 452. In the instant case, the question of who committed the offense was still in issue. *See generally* Udall, Arizona Law of Evidence § 131, 274–5 (1960). So long as the number of photographs is not excessive, the discretion of the trial court in admitting evidence will not be disturbed on appeal. State v. Mohr, 106 Ariz. 402, 476 P.2d 857 (1970).

VII. Did the lower court err in admitting testimony and evidence concerning Brierly's blood *type?*

Brierly argues that the admission of a Xerox copy of medical records kept at the hospital and testimony relating to it were inadmissible on two grounds: (a) as a violation of his doctor-patient privilege and (b) because he was denied the opportunity to cross-examine to determine how the test was run and whether the indicated results actually related to the defendant.

The medical record librarian from the Kennecott Copper Company Hospital brought the medical records describing Brierly's blood grouping and testified to their preparation and contents. The records were made of a physical examination defendant underwent in pursuit of employment. The information was to be kept on record to assist the company in case an employee was injured in the line of work.

■■■ Arizona has adopted the Uniform Business Records as Evidence Act:

16 A.R.S. Rules of Civil Procedure, Rule 44(q) 2:

Any record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

As Udall points out, the Act applies to "any record of an act, condition or event," and it "defines 'business' in such a broad fashion as to include hospitals, professional offices, government offices, and virtually every other type of organized commercial and non-commercial activity." Udall, Arizona Law of Evidence, § 155, 312–13 (1960). The evidence in question certainly falls within the definition of business records in the Act itself and within the reason for the following justification of an exception to the hearsay rule: "[T]he element of *special trustworthiness* of entries made at the time of an event without any motivation for falsification." Udall, *supra.*

The medical records do not fall within the doctor-patient privilege area since it did not involve communications from patient to doctor in the course of treatment. Udall, *supra*, at 145.

We can find no merit in the argument that defendant was denied the opportunity to cross-examine.

VIII. Did the trial court err in admitting defendant's pubic and head hair samples (State's Exhibits Nos. 65 and 66) into evidence?

When Brierly was arrested and taken to jail, he was advised by the doctor that he had to have a routine physical examination. The defendant's request to have an attorney present was denied and the doctor took blood and hair samples. He contests the admission into evidence of the hair samples as a violation of his fourth and sixth amendment rights. He also argues that he had the right to have counsel present at the time the samples were taken.

The United States Supreme Court has held that the constitutional privilege against self-incrimination is only a bar against compelling testimony or a communicative act. Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Neither *Schmerber*, which involved a blood sample, nor the instant case involving hair samples, involve testimonial communications.

In Brierly's Fourth Amendment argument, he contends that the taking of the hair samples was an unreasonable search and seizure because it was made without a warrant when no exigent circumstances existed, Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). We disagree. The defendant had been validly arrested. The taking of hair samples is analogous to the taking of fingerprints and does not involve an unreasonable invasion of the defendant's person. Like the taking of fingerprints, the taking of a hair sample cannot easily be perverted into a form of harassment since the police need only one sample. Davis v. Mississippi, 394 U.S. 721, 89 S.Ct.

1394, 22 L.Ed.2d 676 (1969). We hold that, under the circumstances, the taking of the hair samples did not violate defendant Brierly's fourth amendment rights.

In response to the sixth amendment argument that Brierly had a right to have counsel present, we find the following language from United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), dispositive of the issue:

The Government characterizes the lineup as a mere preparatory step in the gathering of the prosecution's evidence, not different—for Sixth Amendment purposes—from various other preparatory steps, such as systematized or scientific analyzing of the accused's fingerprints, blood sample, clothing, hair, and the like. We think there are differences which preclude such stages being characterized as critical stages at which the accused has the right to the presence of his counsel. Knowledge of the techniques of science and technology is sufficiently available, and the variables in techniques few enough, that the accused has the opportunity for a meaningful confrontation of the Government's case at trial through the ordinary processes of cross-examination of the Government's expert witnesses and the presentation of the evidence of his own experts. The denial of a right to have his counsel present at such analyses does not therefore violate the Sixth Amendment; they are not critical stages since there is minimal risk that his counsel's absence at such stages might derogate from his right to a fair trial. 388 U.S. at 227–228, 87 S.Ct. at 1932.

IX. Did the lower court err in allowing witness Semms to testify that certain stains on the defendant's clothing were of Blood Group "O"?

Brierly contends that since, according to expert testimony, 48–49% of all the people in the United States have "O" type blood, that the admission of testimony regarding the blood type was an exercise in speculation, at best establishing relative-

ly small possibilities. Arizona, however, follows the rule that it is proper in homicide cases to admit evidence of similarity in blood type between deceased's blood and blood found on the defendant's possessions. This type of evidence is not excluded merely because it tends to establish a possibility rather than a probability. State v. Thomas, 78 Ariz. 52, 275 P.2d 408 (1954).

X. Did the court err in allowing a State witness to testify regarding the ballistics examinations and malfunction of the pistol found in Brierly's truck?

The State's witness, an FBI agent, testified that he could not reach any conclusion whether the four bullets found in Mrs. Stevens' head were fired from the pistol found under the defendant's front seat. He did conclude that the test bullets fired from Brierly's pistol were marked with rifling characteristics which would indicate that they came from a barrel in the same general condition as that barrel which fired three of the bullets found in the victim's head. He testified that the fourth bullet did not possess sufficient markings for comparison. He also testified that several hundred thousand weapons have been manufactured which would produce markings identical to those found on the bullets in the victim's head.

Defendant maintains that the substantial prejudice caused to his case by the introduction of the testimony far outweighed its slight probative value and that the admission of the testimony was reversible error. We see no merit in his contention. The fact that the bullets could have been fired from one of several thousand weapons goes to the weight of the testimony and not to its admissibility. State v. Thomas, 78 Ariz. 52, 275 P.2d 408 (1954).

Defendant also alleges that it was error to allow this same witness to testify that the pistol did not function in the normal manner and was difficult to fire. Brierly argues that this testimony is immaterial because there was no testimony concerning how the pistol functioned prior to its being examined and prior to its being taken from his pickup. Again, we hold that the question is one of the weight to be given to the evidence rather than its admissibility. State v. Thomas, *supra.*

XI. Did the trial court err in permitting a state witness to testify to observations and comparisons of various botanical samples?

Brierly submits that it was reversible error to allow this testimony since the grass seeds and weeds found on various pieces of evidence are similar to grass seeds and weeds found throughout the state of Arizona and in many other parts of the United States. As in Section X, we hold that these factors go to the weight of the evidence and not its admissibility. State v. Thomas, *supra.*

XII. Did the court err in allowing a state witness to compare the physical properties of two pieces of broken eyeglass lens found near the deceased's body with vacuum sweepings from the defendant's truck?

Defendant argues that the above comparison was irrelevant and inadmissible since no attempt was made to compare the broken glass to the pair of eyeglasses also found near the body. The testimony was not inadmissible. The comparison which was in fact made was relevant in placing defendant's vehicle at the scene of the crime.

XIII. Did the lower court err when it refused to excuse a prospective juror for cause when that juror stated that he would give law enforcement officers' testimony greater weight than that of ordinary witnesses?

Defendant contends that the trial court erred when it failed to excuse juror No. 6, who was challenged for cause, when the juror stated that he had held the opinion for 40 years that law enforcement officers were more believable than other people and that he would be prone to give an officer's testimony greater weight than the testimony of an ordinary witness. Defendant used one of his peremptory challenges to excuse the witness.

██ **321**

██ After a careful reading of the entire examination of juror No. 6, we are convinced that the denial of the defense's challenge for cause was proper. Although the juror's responses to the initial questioning by Brierly's attorney appeared prejudicial, his neutrality was clearly re-established by his responses to the court's explanation of the role of jurors and their duties in weighing the credibility of witnesses in general. We, therefore, hold that defendant was not prejudiced because he determined to use a peremptory challenge on that juror.

██ XIV. Did the trial court err in allowing the jury to consider the possible imposition of the death penalty because the imposition of the death penalty would be cruel and unusual punishment and because the death penalty was not mentioned or requested by the State in its opening statement?

The defendant submits that the imposition of the death penalty by the court below is unconstitutional and that the sentence should be modified to one of life imprisonment under ARS § 13–1717. In light of Furman v. Georgia, 408 U.S. 238, 92 S. Ct. 2726, 33 L.Ed.2d 346 (1972), and Stewart v. Massachusetts, 408 U.S. 845, 92 S.Ct. 2845, 33 L.Ed.2d 744 (1972), we hereby set aside the sentence of death.

XV. Did the trial court err when it denied defendant's challenge to the formation of the jury panel?

██ Brierly argues that he was denied a fair and impartial trial because the jury list from which his jury was selected was composed of a list of registered voters in Pima County. The governing statute at the time was ARS § 21–301, (sub A):

§ 21–301. Jury list and jury box

A. The board of supervisors at its regular meeting in January, following each biennial general election, or at a special meeting called for that purpose, shall order a list made of all persons within the county qualified to serve as jurors, and shall from time to time revise the list to keep it as complete as practicable, and shall file certified copies of the original and revised lists in the office of the clerk of the superior court.

This court has held that, in the absence of a showing of prejudice, an error in denying a challenge grounded on the fact that prospective jurors' names had been drawn from a list of registered voters, does not require reversal. State v. McGee, 91 Ariz. 101, 370 P.2d 261, cert. denied, 371 U.S. 844, 83 S.Ct. 75, 9 L.Ed.2d 79 (1962). Defendant Brierly has shown no prejudice and, in line with *McGee*, we hold that his assignment of error is without merit.

XVI. Did the trial court err in giving the State's requested instructions Nos. 1, 7 and 13 to the jury?

██ Brierly contends that the following paragraph of instruction No. 1 was erroneously given because it was a comment on the evidence:

If you believe that any witness has wilfully sworn falsely as to any material fact or facts in the case, then you are at liberty to disregard the entire testimony of that witness, except insofar as it may have been corroborated by other credible evidence in the case.

Defendant cites no authority supporting his contention nor does a reading of the paragraph support his position.

██ Brierly next contends that the instruction containing the following sentence violates the presumption of innocence due every defendant: "If the use of such dangerous weapon does in fact cause great bodily harm or death, it is presumed that such harm or death was intended by the assailant." This sentence correctly states the law, State v. Schroeder, 95 Ariz. 255, 389 P.2d 255 (1964), and its inclusion in instruction No. 7 was therefore proper.

██ In addition, Brierly maintains that State's requested instruction No. 13 violated the defendant's right not to bear witness against himself and violated the pre-

sumption of innocence which attaches to a defendant. Instruction 13 states that:

> You are further instructed that if you believe that the evidence has shown that a homicide has been committed with a deadly weapon and no circumstances of mitigation, justification, or excuse are present, you, as jurors, may imply malice. The malice thus implied is that malice aforethought which is necessary to sustain a charge of murder.

This instruction is in accord with ARS § 13-454 and State v. Preis, 89 Ariz. 336, 362 P.2d 660 (1961).

XVII. Did the trial court err in refusing to give defendant's requested manslaughter instructions and did it err in deleting the manslaughter portions from other instructions requested by defendant?

Brierly's requested instructions Nos. 1, 18 and 20 discussed manslaughter. His requested instructions Nos. 10, 13 and 16 were modified to eliminate all reference to voluntary manslaughter. The essence of the defendant's position is that the jury should have been instructed on manslaughter.

For the court to have properly instructed on voluntary manslaughter, the evidence must have shown the defendant's conduct fell within our voluntary manslaughter statute, ARS § 13-456, a killing "upon sudden quarrel or heat of passion." We find nothing in the evidence which would establish that the death resulted from a sudden quarrel or in the heat of passion and hold that that option was properly denied the jury. See State v. Sorensen, 104 Ariz. 503, 455 P.2d 981 (1969).

XVIII. Did the trial court err in refusing to strike hearsay from certain state's exhibits and in refusing to strike in their entirety certain other state's exhibits?

Brierly argues that the trial court erred in permitting exhibits to be introduced into evidence which contained any hearsay (for example, the tag on Exhibit No. 9 contained the words "Bloodstained nylon slip containing vegetation"). We

note, however, that at the time these exhibits were introduced into evidence, defendant's attorney made no objections to any of the hearsay information on the exhibits. As we said in State v. Evans, 88 Ariz. 364, 356 P.2d 1106 (1960): "An objection to the admission of evidence must state the reason and if it is not objectionable on the ground stated, it is not error for the court to admit it, even though there might be some other proper reason for its rejection not raised by the objection as made." 88 Ariz. at 373, 356 P.2d at 1111. Brierly's failure to raise this specific objection constituted a waiver of the objection.

XIX. Did the trial court err in admitting a woman's slip found in the bed of the defendant's pickup or in admitting an eyeglass frame identified as belonging to the deceased?

Brierly's position is that the slip "must have been positively identified as belonging to the decedent, or having been worn by her immediately prior to her death, in order for it to be admissible into evidence against" him. The fact that the slip was found, with a dress and a purse identified as belonging to the decedent, considered with the fact that the decedent's clothes were missing, we find sufficient to connect the slip with the crime in question. The court did not abuse its discretion in admitting the slip into evidence. See Arnold v. Frigid Food Express Co., 9 Ariz. App. 472, 453 P.2d 983 (1969).

Brierly also contends that the admission of an eyeglass frame found near the body was error since insufficient foundation was laid to connect it with the killing. We disagree. We note that Mrs. Stevens' husband identified the frames as belonging to his wife and hold that this testimony laid sufficient foundation for the admission of the frames into evidence. The admission of evidence is a matter largely within the discretion of the trial court and its ruling will not be disturbed unless an abuse of discretion is shown. Throop v. F. E. Young & Co., 94 Ariz. 146, 382 P.2d 560 (1963).

XX. Did the trial court err in allowing five of the State's witnesses to testify even though their names were not endorsed on the information?

Arizona Rule of Criminal Procedure 153, 17 A.R.S. provides:

When an indictment or information is filed, the names of all the witnesses or deponents on whose evidence the indictment or information was based shall be endorsed thereon before it is presented, and the county attorney shall endorse on the indictment or information, at such time as the court may by rule or otherwise prescribe, the names of other witnesses he proposes to call. A failure to so endorse the names thereon shall not affect the validity or sufficiency of the indictment or information, but the court in which the indictment or information was filed shall, upon application of the defendant, direct the names of such witnesses to be endorsed thereon. No continuance shall be allowed because of the failure to endorse such names thereon unless such application was made at the earliest opportunity and then only if a continuance is necessary in the interest of justice.

Brierly contends that he was denied a fair trial because the witnesses in question were permitted to testify over his objection even though their names were not endorsed on the information. After reviewing the record, we find the following language from State v. Gause, 107 Ariz. 491, 489 P. 2d 830 (1971), dispositive of the issue: Their testimony "was . . . of no central importance. A continuance would have been an adequate remedy for appellant. Since none was asked for, there can be no claim of prejudice now as to lack of preparedness to meet his testimony. When appellant has an adequate remedy to prevent surprise and unfairness, no claim of prejudice will be heard." 107 Ariz. at 497, 489 P.2d at 836.

XXI. Did the trial court err in permitting a State witness to testify and identify blood type of the decedent?

Brierly argues that the foundation was insufficient to allow Carl Kempe to testify that a blood sample from the deceased was type A since there was no evidence that the "blood samples submitted to him were taken from a human being."

Dr. Louis Hirsch testified that he removed the blood sample from the deceased and that the vial never left his control until until it was taken to Mr. Peterson at the office of the coroner's pathologist. Next, Anna Sterngast, a city criminologist, testified that she picked up the vial from Peterson and gave it to Captain Kempe. The above testimony establishing chain of custody provides sufficient foundation that the blood was human. State v. Rascon, 97 Ariz. 336, 400 P.2d 330 (1965).

XXII. Did the court err in allowing Exhibit No. 78, a Xerox copy of a page of a log kept by State's witness, Carl Kempe, in evidence?

Brierly argues that the Xerox of a page from the State criminologist's log book was inadmissible since it was hearsay and since its foundation was provided by two witnesses who should not have been allowed to testify.

The testimony in the record reveals that the judge admitted this exhibit for the limited purpose of showing the label at the bottom of the exhibit. He stated at the time that its admission was important "because it is a chain in the evidence of what Captain Kempe did." The Xerox page was admitted over objection, but it was ordered that it not be shown to the jury.

The admission of evidence is largely within the discretion of the trial court, Throop v. F. E. Young & Co., *supra,* and, in a case such as this one, where the jury never saw the exhibit, we can find no abuse of discretion.

XXIII. Did the trial court err in admitting State's Exhibit No. 25, grass, twigs, and rocks enclosed in a plastic container?

**324**

Brierly contends that it was error to admit the exhibit because of insufficient foundation since Deputy Cheske could not identify the exhibit. A review of the testimony convinces us that an adequate foundation was laid. Deputy Cheske did not identify the container but identified its contents as the twigs and grass he had collected from the desert near the body. He testified that the container had been changed. The combined testimony of Cheske, who collected the specimens, Agent Semms to whom they were sent, and Mr. Flach who changed the container, establishes a chain of custody and provides sufficient foundation. Udall, *supra,* at 272.

XXIV. Did the lower court err in allowing Dr. Louis Hirsch to testify regarding what instruments could have caused the lacerations on Mrs. Stevens' head?

Brierly objects to Dr. Hirsch's testimony on three grounds: (1) that Dr. Hirsch was not qualified to testify as to what objects could have caused the lacerations on the victim's head, (2) that the cause of the lacerations was not relevant, and (3) that his testimony was too remote since it dealt with what could possibly have caused the lacerations rather than what probably caused them.

 In answer to the challenge of Dr. Hirsch's qualifications, we hold that whether a witness is competent to testify as an expert is a matter primarily for the trial court and one largely within its discretion. Allied Van Lines v. Parsons, 80 Ariz. 88, 293 P.2d 430 (1956). We can see no abuse of discretion in allowing a medical doctor who has examined the victim's wounds and the instrument to testify about a possible connection between the two. In response to grounds (2) and (3), we hold that conclusions of witnesses are relevant and have probative value even though stated in terms of a possibility rather than a probability. State v. Thomas, *supra.* Dr. Hirsch's testimony that it was possible that the dagger found in defendant's truck caused the lacerations was properly admitted into evidence.

 XXV. Did the trial court err in denying defendant's motion for a directed verdict on the ground that the State failed to prove that the court had jurisdiction and venue to try the offense?

Brierly contends that although the body was found in Pima County, there was no evidence presented that the crime was committed in Pima County. He cites State v. Howe, 69 Ariz. 199, 211 P.2d 467 (1949), for the proposition that, for the purposes of venue, the crime must have been committed within the boundaries of the county to give the superior court jurisdiction to try it. Although *Howe* does stand for defendant's proposition, this court in *Howe* also held that lack of direct proof of venue is not fatal and that venue in a criminal case may be established by circumstantial evidence. We hold that the State in the instant case presented sufficient circumstantial evidence to satisfy the venue requirements.

 XXVI. Did the trial court err in denying defendant's motion for directed verdict respecting murder in the first degree because of the absence of evidence establishing premeditation or deliberation under ARS § 13–452?

This court in State v. Chase, 78 Ariz. 240, 278 P.2d 423 (1954), said that the elements of a wilful, deliberate and premeditated murder "are susceptible of proof by circumstantial evidence, so long as such evidence is sufficient to establish the fact of their existence beyond a reasonable doubt." 78 Ariz. at 241, 278 P.2d at 424. "There is no duty on the part of the trial court to direct an acquittal where there is substantial evidence that the defendant committed the crime charged. . . . This court, on review of the lower court's denial of defendant's motion for directed verdict, must view the facts most strongly in favor of upholding the verdict of the jury." State v. Acosta, 101 Ariz. 127 at 130, 416 P.2d 560 at 563 (1966). A review of the record convinces us that, in light of the above standards, there was sufficient evidence to

establish that the killing was wilful, deliberate and premeditated.

XXVII. Did the trial court err in admitting a photograph of the gun found in defendant's truck?

Brierly contends that it was error to admit a photograph of the gun found in his truck since the gun had already been admitted. He argues that to admit both the gun and the photograph places undue emphasis on the weapon.

The State argued at the time of the admission of the gun into evidence that it was necessary "to show exactly what the weapon looked like back before any testing or examination was done by the serologists." The trial judge is allowed reasonable discretion in determining admissibility of evidence, State v. Turner, 92 Ariz. 214, 375 P.2d 567 (1962), and although the photograph appears to be a needless repetition of an already-admitted exhibit, we can find no reversible error in its admission.

XXVIII. Did the trial court err in allowing a State's witness to testify regarding the accuracy of a clock some two weeks after the murder?

Brierly argues that "no testimony was advanced that the clock in question was running or operable during any of the two-week period intervening between the time in question and the time when it was checked by . . . [the witness], that the clock was in fact operating the same manner when checked as on September 27, 1969, that it had not been reset or tampered with in the interim or anything of that nature." Again, the admission of evidence is generally within the discretion of the trial judge, State v. Turner, *supra,* and we will not disturb the ruling unless an abuse of discretion can be shown. The fact that the examination of the clock was a week later goes to the weight, not the admissibility of the evidence. State v. Thomas, *supra.*

XXIX. Did the trial court err in refusing to admit defendant to bail?

The Arizona Constitution, article 2, § 22, ARS, provides that "[a]ll persons charged with crime shall be bailable by sufficient sureties, except for capital offenses when the proof is evident or the presumption great." ARS § 13–1571, subsec. A provides in part that "[n]o person in custody for a capital offense shall, before conviction, be admitted to bail if the proof is evident or the presumption great that he is guilty of the offense, or, if the offense is divided into degrees, that he is guilty of a degree which may be punished capitally. . . ." A review of the evidence presented at the preliminary hearing convinces us that the judge was correct in determining that the presumption was great that the defendant was guilty of a capital offense. He had been stopped within a mile of Mrs. Stevens' nude body; was himself covered with blood and was found with Mrs. Stevens' clothes and purse in his truck. A 38-caliber revolver and a dagger had been found in his truck, the gun sitting in a pool of blood. Defendant offered no explanation for the clothes or the weapons.

ARS § 13–1571 provides that a person charged with a capital offense is bailable if he was "indicted or informed against for an offense and was not brought to trial within sixty days after the indictment was found or the information filed." Brierly argues that he was entitled to be admitted to bail because more than sixty days had passed from the time the information was filed to the time defendant sought relief on bail. We hold that Brierly waived the right to bail under § 13–1571 when on December 18, 1969, he stipulated to a continuance of the trial to January 5, 1970.

Finally, we consider whether the trial court's March 17, 1972, denial of Brierly's motion for a new trial on newly-discovered evidence was in error. The governing statute covering mandatory grounds for a

new trial is 17 ARS, Rule 310 of the Arizona Rules of Criminal Procedure:

> The Court shall grant a new trial if any of the following grounds is established: . . . . (3) That new and material evidence, which if introduced at the trial would probably have changed the verdict or the finding of the court, is discovered which the defendant could not with reasonable diligence have discovered and produced upon the trial.

Dr. Faye Anderson, a psychologist from San Diego, testified at the hearing that Bettie Stevens had visited her four or five times in 1969 and had called her approximately a dozen times about her marital problems. She testified that Mrs. Stevens had told her that Mr. Stevens was running around and that she was terrified that her husband was going to kill her. Dr. Anderson also testified that Bettie Stevens had called her from a pay phone the night of her death and had said her husband had told her he was going to kill her and that he would have an alibi. Brierly had suggested throughout the trial that Mr. Stevens was the likely person to have had a motive for the killing and it is on the basis of this newly-discovered evidence that he made his motion for a new trial.

Both counsel for the State and the defendant apparently proceeded on the assumption that the testimony and evidence of Dr. Anderson was admissible. However, in view of our following position on the motion for new trial, we shall not address ourselves to that question.

■ First, motions for new trial are not looked upon with favor in Arizona and a denial of such a motion will not be grounds for reversal unless it affirmatively appears that the court abused its discretion. State v. Mason, 105 Ariz. 466, 466 P.2d 760 (1970). The trial court in the instant case noted that Dr. Anderson was not a particularly credible witness. This Court stated in State v. Mason, *supra,* that a new trial for newly-discovered evidence is required if the introduction of the evidence at trial would probably have changed the verdict, and noted that:

> ' "[I]t is therefore necessary that it shall appear to the court hearing the motion that [the new evidence] is probably true. The witness who is expected to testify must appear to the court to be credible. His credibility is to be determined by the judge hearing the motion. * * *"
>
> * * * * * *
>
> 'The trial judge was in a much better position than we are to determine the weight to be given the affidavits and whether or not the testimony set forth in them would probably change the result in case of a new trial.'

The trial judge undoubtably [sic] felt that Collins' testimony would not likely influence a jury on a retrial. The court below did not abuse its discretion in denying defendant's motion. 105 Ariz. at 468, 466 P.2d at 762.

■ We note that, in the instant case, there was ample circumstantial evidence connecting Brierly with the crime. This fact, plus the fact that Dr. Anderson appears to have been a less than credible witness, leads us to our conclusion that the trial court did not abuse its discretion in denying Brierly's motion.

Although Brierly's conviction stands affirmed, in light of the unconstitutionality of the sentence of death under Furman v. Georgia and Stewart v. Massachusetts, *supra,* we hereby reduce the sentence to life imprisonment. A.R.S. § 13–1717, subsec. B.

CAMERON, V. C. J., STRUCKMEYER and HOLOHAN, JJ., and MARY ANNE RICHEY, Superior Court Judge, Pima County, concur.

Note: Justice LOCKWOOD did not participate in the determination of this matter. MARY ANNE RICHEY, Judge of the Superior Court of Pima County, was called to sit in her stead.